**Richard STOLL and Kathryn Stoll,**
**Appellants–Defendants,**

**v.**

**Fred GRIMM and Evelyn Grimm,**
**Appellees–Plaintiffs.**

No. 09A05–9608–CV–332.

Court of Appeals of Indiana.

June 19, 1997.

Steven J. Rubick, Indianapolis, for Appellants–Defendants.

John R. Hillis, Hillis & Hillis, Logansport, for Appellees–Plaintiffs.

## OPINION

SHARPNACK, Chief Judge.

Richard and Kathryn Stoll (collectively the "sellers") appeal the entry of judgment in favor of Fred and Evelyn Grimm (collectively the "purchasers"), ordering specific performance of an agreement for the sale of real estate, abatement of the agreed purchase price, and payment of attorney fees. The sellers raise three issues for our review, which we restate as:

(1) whether the trial court properly ordered specific performance of the contract;

(2) whether the trial court properly ordered a reduction of the purchase price to represent damages under constructive fraud; and

(3) whether the trial court properly awarded attorney fees in favor of the purchasers.

We affirm in part and reverse in part.

### Facts [1]

The evidence most favorable to the judgment follows. The sellers owned the Tall

---

1. We note that the sellers failed to file a separately bound table of contents in violation of Ind. Appellate Rule 7.1. They also failed to make notations in the margin of each page of the

Sycamore Campground (the "campground") in Cass County, Indiana. In 1992, the sellers decided to sell the campground and contacted Harold Goehring to act as their consultant. On July 21, 1992, the sellers entered into an agreement giving Goehring, who served as an authorized agent for Resorts International, Inc., the exclusive right to sell the campground. After the sellers signed the agreement, Goehring prepared a video of the campground to show prospective buyers. Goehring prepared the video with the sellers' assistance; Richard explained some features of the campground, and Kathryn described shopping opportunities in the area.

Along with the video, Goehring prepared a brochure that described the campground and included some pictures. Although the sellers provided Goehring with the specific information relating to the campground, they did not take the pictures. The brochure contained several pictures of the electrical units. The brochure also included a description of the "electrical services" in the campground. The electrical services were detailed as follows:

"a. within the campground we have the main power line with six transformers

b. 109 sites with 15 amp recepticles [sic] and 30 amp lines

12 sites with 30 amp recepticles [sic]

39 sites in club area with 15 amp recepticales [sic] and 30 amp lines

NOTE—I have had three electricians check the lines and verify that the lines are safe for 30 amp usage."

Record, p. 385. The sellers neither reviewed the brochure in its final form nor approved its use. However, the sellers knew that the brochure had been prepared for prospective buyers to view.

In late 1992, the purchasers saw an advertisement which listed the campground for sale. As a result, the purchasers contacted Goehring and arranged to visit the campground. Later, the purchasers received the video and brochure from Goehring.

On May 25, 1993, the purchasers and sellers entered into a "Buy and Sell Agreement" (the "agreement") for the sale of the campground that set the purchase price at $250,000 with a downpayment of $50,000. Record, p. 131. The parties agreed that the downpayment would be paid from the proceeds of a personal injury settlement that the purchasers anticipated receiving at a later date. In addition, the agreement required the purchasers to make annual payments of $10,050 in 1994, $10,050 in 1995, $15,000 in 1996, $19,950 in 1997, and $21,100 in 1998. The sellers took possession of the campground after signing the agreement. The agreement indicated that Goehring was acting as the sellers' agent. Neither party was represented by an attorney.

In addition to the sale of the campground, the agreement also included the sale of the sellers' trailer which belonged to the sellers and was subject to a monthly loan payment.[2] Under the agreement, the purchasers were required to pay the trailer payments until the down payment was made, at which time the sellers would give the purchasers a credit from the downpayment.

One provision in the agreement set forth the warranties of the seller. This provision (the "warranty provision") provided in relevant part that "a. There are not restrictions, easements, zoning or governmental regulations that would prevent the reasonable use of the property for campground/RV park purposes . . . . c. Seller has informed Buyer of any hidden or latent defects of which Seller has knowledge." Record, p. 132. Another provision (the "inspection provision") warned the buyer as follows:

"29. *CAUTION: READ CAREFULLY*. By signing the Agreement, Buyer is representing that the Buyer is aware that inspection services of buildings and building

transcript indicating the name of each witness and the type of examination, as required by App.R. 7.2(A)(3)(a). Finally, the sellers failed to include a verbatim statement of the judgment, as required by App.R. 8.3(A)(4). Although these failures encumber our review of the issues presented, we will nevertheless reach the merits of the sellers' claims.

2. Although the agreement required that a list of the equipment and fixtures that were part of the sale be attached to the agreement, the list is not attached to the agreement in the record of proceedings.

components and systems are commercially available at a nominal fee, and that the premises have been examined by Buyer and/or inspectors hired by buyer as fully as Buyer desires. Buyer agrees that no representations have been made by Seller, or any real estate salesperson, regarding any aspect of the premises or this sale transaction except as set forth in this agreement or in a separately signed writing which is entitled 'guarantee' or 'warranty'. Buyer hereby acknowledges receipt of a copy of this agreement. . . .

/x/ Fred H. Grimm"

Record, p. 134.

The purchasers received the $50,000 from the personal injury settlement in November of 1994, and later deposited that amount into a purchase account. The agreement called for the downpayment to be made at the closing or when the buyers received the personal injury settlement. As a closing date was never set or provided for, the buyers paid the amounts due into a purchase account at Salin Bank and Trust Company. The purchasers also deposited $10,050 into the purchase account in 1994, which represented the payment under the agreement due in 1994. On March 3, 1995, the purchasers deposited $10,000 into the purchase account, representing the payment under the agreement due in 1995.[3] In addition, the purchasers began making the trailer payments in the amount of $174.75 per month in May of 1993, and continued to do so thereafter.

Soon after the purchasers took possession of the campground, they began to experience problems with the electrical system, including approximately six fires in the electrical panel boxes that supplied the trailers with electricity. As a result of these continuous problems with the electrical system, the purchasers contacted Krysevig Electric in the spring of 1995 to replace portions of the electrical system. The cost of the work totaled $27,238.

Although the purchasers tried to contact the sellers many times to arrange a closing date, the date was never set. On March 13, 1995, the purchasers filed a complaint, seeking specific performance under the agreement, an abatement or reduction of the purchase price, an assurance that the property had no environmental problems, a transfer of title for the trailers, and attorney fees. On April 12, 1995, the sellers filed an answer and a counter-claim which alleged various breaches of contract by the purchasers. On January 18, 1996, the purchasers filed an amended complaint which added a claim for unjust enrichment. The trial court held a trial on February 5, 1996, and later entered findings of fact and conclusions thereon. The relevant findings and conclusions are as follows:

"7. The Sellers have not designated the time or place of closing. The Sellers have not provided to the Buyers the new survey; evidence of title; affidavit of indebtedness; affidavit of suppliers and professional services; disclosure document pursuant to I.C. 13–7–22.5–10; and a current list of ·equipment, fixtures, improvements and appurtenances.

8. The Buyers have deposited the Fifty Thousand ($50,000) Dollars down payment and the payments due in 1994 and 1995 into a certain Purchase Account at Salin Bank and Trust, Logansport. . . . Such deposit reasonably conforms with the terms expressed in Paragraph 1 of the Buy and Sell Agreement. . . .

9. The Buyers have made the monthly trailer payments of One Hundred Seventy-four and Seventy-five Hundredths ($174.75) Dollars from the date of the Buy and Sell Agreement to the date of the hearing February 23, 1996, for thirty-one (31) payments; said payments totaling Five Thousand Four Hundred Seventeen and Twenty-five Hundredths ($5,417.25) Dollars. Such sum, together with trailer payments made after February 23, 1996, if any, shall be credited at closing against the down payment now on deposit. . . .

10. The Buyers have maintained and repaired the Tall Sycamore Campground

---

**3.** During the trial, Fred Grimm testified that the payment for 1995 was $50 less than the amount required under the agreement because there was extra money in the purchase account to offset the difference.

from the date of the Buy and Sell Agreement to the present. . . .

11. The Buyers have expended Twenty-one Thousand Three Hundred Fifty-five and Sixty-nine Hundredths ($21,355.69) Dollars of their own money for the general maintenance and repair of Tall Sycamore Campgrounds.

12. The Sellers warranted, pursuant to Paragraph 13 of the Buy and Sell Agreement, that there were no governmental regulations (National Electric Code) that would prevent the reasonable use of the property for a Campground/RV Park Purposes and that the Sellers had informed the Buyers of any hidden or latent defects of which the Sellers had knowledge.

13. The electrical distribution system of the Tall Sycamore Campgrounds as it existed on May 25, 1993, did not meet National Code in that there were no ground fault interrupters on the electrical outlets; there were no shut-off switches at each electrical box, ... the system was not a total 30–amp system as represented by the Sellers and as required by the National Electric Code; that certain electrical boxes had wiring which by-passed the fuses and defeated the purpose of said fuses ... and meters and electric lines were attached to and imbedded in trees.

14. The Sellers had made attempts to bring such electrical distribution system up to National Code, but had failed to bring the entire system up to code at the time of the execution of the Buy and Sell Agreement.

15. The deficiencies contained in said electrical distribution system were deficiencies that were not readily apparent to the Buyers and would not normally be discovered in an inspection by the Buyers. Further the Sellers knew, or should have known, of the deficiencies in said electrical system and should have informed the Buyers of those deficiencies as required by Paragraph 13(c) of the Agreement.

16. In order to bring said electrical distribution system up to national code and operate in a reasonable manner, it would require the expenditure of approximately Eighty-six Thousand Two Hundred Forty-eight ($86,248.00) Dollars as per Krysevig's testimony.

17. Because of the electrical fires occurring due to the deficiencies in the electrical distribution system in 1993 and 1994, the Grimms expended Thirty Thousand ($30,000.00) Dollars in the spring, 1995, of their personal monies to repair and maintain a portion of the electrical distribution system in the campgrounds. Said Thirty Thousand ($30,000.00) Dollars is part and parcel of the total estimate given by Krysevig Electrical.

18. During the time that the Grimms were in possession of the Tall Sycamore Campgrounds, they expended from their own personal funds, a total of Fifty-one Thousand Three Hundred Fifty-five and Sixty-nine Hundredths ($51,355.69) Dollars. They also incurred [$8,372.33 in attorney fees].

\* \* \* \* \* \*

20. Pursuant to Paragraph 26 of the Buy and Sell Agreement, this Agreement shall be construed and enforced in accordance with the laws of the State of Indiana. Pursuant to Paragraph 10 of the Buy and Sell Agreement, the land contract to be generated by the Sellers or Sellers' attorney will contain the customary clauses found in standard land contracts for Indiana. A standard clause in Indiana land contracts is that if a party to a contract/buy/sell agreement is forced to sue the other party, the non-prevailing party shall be responsible for and pay the prevailing party's attorney fees.

## II

## CONCLUSIONS OF LAW

1 . . . . there is a binding agreement between the Buyers and Sellers as set out in the Buy and Sell Agreement. . . .

2. The Court concludes that the Sellers have not performed their duties under this Agreement in that neither a closing date was set by the Sellers nor closing documents delivered to the Buyers as per said Agreement.

3. According to the evidence, it would cost approximately Eight-six Thousand Two Hundred Forty-eight ($86,248.00) Dollars to bring the electrical system up to the standards of the National Electric Code. . . .

4. Due to the deficiencies in the electrical distribution system, it would be inequitable for the Sellers to receive the full purchase price in light of their constructive fraud committed upon the Buyers, especially in light of the fact that the Buyers were in possession of the real estate awaiting the Sellers' delivery of closing documents and setting a closing date.

5. The Buyers are entitled to specific performance of the Buy and Sell Agreement with the abatement of the purchase price. . . ."

Record, pp. 107–111. As a result, the trial court ordered specific performance of the agreement, a reduction of the purchase price by $86,248.00, and an $8,372.00 attorney fee award in favor of the purchasers. In addition, the trial court directed the sellers to submit all proposed closing documents within thirty days of the order.

On May 22, 1996, the sellers filed a request for stay of proceedings to enforce the judgment pending appeal. The trial court granted the request on June 10, 1996. The sellers now appeal the judgment.

### Standard of Review

█ Shortly before trial, the purchasers filed a motion for findings of fact and conclusions thereon. When the trial court makes special findings at the request of a party, we may not affirm the judgment on any basis supported by the evidence in the record. *Donavan v. Ivy Knoll Apts. Partnership*, 537 N.E.2d 47, 50 (Ind.Ct.App.1989). Rather, we must determine if the specific findings are adequate to support the judgment. *Id.* We will not reverse unless the findings or conclusions drawn therefrom are erroneous. *Id.*

█ In determining whether the findings of fact are clearly erroneous, we neither reweigh the evidence nor judge the credibili-

ty of the evidence. *Matter of Estate of Banko*, 622 N.E.2d 476, 481 (Ind.1993), *reh'g denied.* Rather, we consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* The findings are clearly erroneous only when the record lacks any facts or reasonable inferences to support them. *DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind.Ct.App. 1991), *reh'g denied, trans. denied.* A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *Id.* Particular deference is given to the judgment where the proceeding sounds in equity. *Donavan*, 537 N.E.2d at 50.

### I.

The first issue raised for our review is whether the trial court properly ordered specific performance of the agreement. The sellers claim the purchasers breached the agreement by failing to make the $50,000 downpayment and, therefore, were not entitled to specific performance of the agreement. In the alternative, the sellers argue that the purchasers did not agree to the terms in the agreement and, therefore, that a contract never existed. Specifically, they assert:

"If a contract existed between the parties, the fact that the [sellers] released control and possession of the campground established that they had performed under the contract and the [purchasers] were in breach for failing and refusing to make any payments under the contract. On the other hand, if certain terms and conditions of the executed Buy and Sell Agreement were in dispute, then there was never a meeting of the minds between the parties and there could thus be no contract. Under either conclusion, the [purchasers] would have no right to the continued control and possession of the campground and no right to claim specific performance of the Buy and Sell Agreement."

Appellants' brief, p. 19. We will consider each of these arguments in turn.[4]

4. We note that the sellers also challenge the reduction of the purchase price. We reserve our

discussion of the propriety of the reduction until part II of this opinion.

With respect to the sellers' argument that the purchasers breached the agreement by failing to make the required payments, we find no reversible error. In its findings, the trial court found that the purchasers deposited the downpayment, as well as the payments due under the agreement in 1994 and 1995, into a purchase account. The evidence supports this finding. Fred Grimm testified that he received the $50,000 from the personal injury settlement in November of 1994, and that shortly thereafter he deposited the money into the purchase account. The purchasers also admitted a quarterly statement of the purchase account into evidence that reflected a substantial balance. Because there is evidence to support the findings, they are not clearly erroneous. *See De-Haan,* 572 N.E.2d at 1320.

Next, the trial court concluded that "[s]uch deposit reasonably conforms with the terms expressed in Paragraph 1 of the [agreement]." Record, p. 109. Under paragraph 1 of the agreement, the purchasers were required to provide a $50,000 cash down payment at the close of sale. Handwritten into the agreement were the following terms, "DOWNPAYMENT TO BE PAYED WHEN GRIMM (V.) EME FILE # 35454–02–LPS ATLANTIC CITY, N.J. 08401–7278 PAY'S [sic] SEE ATTACHED STIPULATION. THE GRIMM [sic] TO GIVE STALL'S [sic] SECURITY INTEREST IN THE AMOUNT OF $50,000.00 IN THE ABOVE SETTLEMENT." Record, p. 131. The trial court also found that the sellers had failed to comply with their obligations to provide documents required for closing or to establish a date for closing. There is evidence that supports this finding. As a result, we agree with the trial court that the purchasers complied with the terms of the agreement by depositing the payment into the purchase account. Therefore, the purchasers did not breach the agreement. Accordingly, we find no merit to the sellers' contention that the trial court erred by granting specific perfor-

mance on the basis that the purchasers breached the terms of the agreement.

The sellers also argue that the purchasers did not agree to the terms of the agreement and, therefore, that a contract never existed. The sellers rely upon the purchasers' alleged claim that there were additional terms which the parties agreed to, but which were not reflected in the agreement. Although the sellers do not set forth these "additional terms," they suggest that the fact the purchasers agreed to a purchase price of $250,000 but later claimed the electrical system was below code and that they were entitled to a reduction in the purchase price constitutes an additional term.[5] Because we address whether the trial court properly abated the purchase price in part II of this opinion, we reserve a discussion as to the effect of these "additional terms." At this point, our response to the sellers' argument is limited to the right of the trial court to award specific performance of a contract. It is a matter of course for a trial court to grant specific performance of a valid contract for the sale of real estate. *Ridenour v. France,* 442 N.E.2d 716, 718 (Ind.Ct.App. 1982); *see Bohlin v. Jungbauer,* 615 N.E.2d 438 (Ind.Ct.App.1993) (awarding specific performance of a purchase agreement). A contract for the sale of property need only be reasonably definite and binding as to its material terms to enforce by specific performance. *Donavan,* 537 N.E.2d at 53. When construing a contract, we will not find a lack of mutuality or uncertainty where a reasonable and logical interpretation will render the contract valid and enforceable. *Id.* The decision whether to grant a request for specific performance is within the trial court's discretion. *Claise v. Bernardi,* 413 N.E.2d 609, 612 (Ind.Ct.App.1980). We will reverse only upon a showing that the trial court abused its discretion. *Id.*

In the present case, the trial court determined that the parties entered into a

---

**5.** We disagree with the sellers' characterization of the purchasers' legal position. In their amended complaint, the purchasers sought specific performance because the sellers failed to set a closing date and failed to forward the closing documents. The purchasers sought an abate-

ment of the purchase price because they claimed that the sellers misrepresented the condition of electrical system. They did not argue that there was an additional term of the contract. We find the sellers' argument to be without merit.

binding agreement. The evidence before the trial court indicated that the parties entered into a written contract for the sale of the campground. The purchasers agreed to make a downpayment from the settlement they received from an unrelated personal injury case, as well as annual payments from 1994 to 1998. The sellers agreed to transfer possession of the campground at the signing of the agreement. They also agreed to designate a place to hold the closing. Other evidence also indicated that the purchasers paid the amounts due under the agreement into a purchase account and that the sellers transferred possession of the campground to the purchasers.

This evidence describes an agreement that is reasonably definite and binding as to its material terms, and we cannot say that the agreement is so uncertain that a reasonable or a logical interpretation is impossible. *See Donavan,* 537 N.E.2d at 47. Because the agreement is not too indefinite to be enforced, we find that the trial court properly awarded specific performance. *Id.*

## II.

The second issue raised for our review is whether the trial court properly ordered a reduction of the purchase price as damages for constructive fraud. The trial court found that the sellers provided a warranty for the condition of the electrical system, that the sellers knew or should have known about the actual condition of the electrical system, that the sellers should have informed the purchasers of the electrical system's condition, and that the deficiencies in the system were not readily apparent to the purchasers and would not normally have been discovered by inspection. Based on these findings, the trial court concluded that the sellers committed constructive fraud and abated the purchase price in accordance with an estimate of the cost for an updated electrical system.

On appeal, the sellers primarily challenge the trial court's conclusion that they provided a warranty for the condition of the campground's electrical system. The sellers argue that there was no evidence they made representations to the purchasers regarding the electrical system and that the evidence actually established the electrical system was in working condition. As a result, the sellers conclude that the judgment is clearly erroneous.

Constructive fraud is defined as "fraud which arises by operation of law from a course of conduct which, if sanctioned by law, would 'secure an unconscionable advantage, irrespective of the existence or evidence of actual intent to defraud.'" *Mullen v. Cogdell,* 643 N.E.2d 390, 401 (Ind.Ct.App. 1994) (quoting *Paramo v. Edwards,* 563 N.E.2d 595, 598 (Ind.1990)), *reh'g denied, trans. denied.* Constructive fraud encompasses several related theories, all of which are based on the premise that there are situations which might not amount to actual fraud, but which are "so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent." *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 324 (Ind.Ct.App. 1991).

For example, a constructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship. *Id.* Constructive fraud also includes what has been deemed in other jurisdictions as "legal fraud" or "fraud in law." *Id.* These theories recognize that certain conduct should be prohibited because it is inherently likely to create an injustice. Thus, a constructive fraud in the absence of a confidential relation may arise where: (1) a seller makes unqualified statements to induce another to make a purchase; (2) the buyer relies upon the statements; and (3) the seller has professed to the buyer that he has knowledge of the truth of those statements. *Id.* The law recognizes that in a buyer-seller relationship one party may be in the unique possession of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other. *Mullen,* 643 N.E.2d at 401.

Applying these principles to the present case, we find the trial court properly concluded that the sellers were liable to the purchasers under the theory of constructive fraud. The evidence most favorable to the judgment shows that the sellers provided

specific information about the campground with which Goehring made the brochure. The sellers knew that the brochure would be sent to prospective purchasers. The brochure included a representation that three electricians had checked the electrical lines and had verified that they were safe for thirty amp usage. However, the purchasers' witness, electrician Al Krysevig, testified that the electrical system was not in the condition described in the brochure. Krysevig testified that he visited the campground several times to repair damages from electrical fires and, ultimately, that he inspected the entire campground. On October 10, 1994, Krysevig issued a report noting that six "major violations" existed, such as the absence of ground fault interrupters on the electrical outlets and disconnect switches at the electrical boxes, the failure to have a four-wire system instead of a three-wire system, the failure to have proper clearance for the overhead conductors, and the presence of meters and electrical lines attached to or imbedded in trees. Record, p. 263. Krysevig also testified that these deficiencies would not normally be discovered during an inspection. Further, the sellers indicated that they knew about a proposed regulation by the State in conjunction with the Indiana Campground Owner's Association which would require most campgrounds to upgrade to thirty amp receptacles. In accordance with this proposed regulation, the sellers changed some of the receptacles and added meters.

In the warranty provision under the agreement, the sellers represented that there were no "restrictions, easements, zoning or governmental regulations that would prevent the reasonable use of the property for campground/RV park purposes." Record, p. 132. Further, the warranty provision stated that the sellers had informed the buyer of any hidden or latent defects. Despite these assurances, the purchasers began to have electrical fires shortly after taking possession of the campground. When the purchasers contacted the sellers to discuss these fires, the sellers admitted that there had been some problems with the electrical plugs catching on fire.

After reviewing the record, we find that there is sufficient evidence that the sellers made an unqualified statement regarding the electrical system to use in the brochure for prospective buyers. The sellers represented unequivocally that three electricians had checked the lines and verified that they were safe for thirty amp use. The parties do not dispute that a prospective buyer would have relied on that representation. Further, the evidence supports the inference that the purchasers developed an interest in the campground after reading the brochure and that they decided to purchase the campground based in part on the statements in it. Finally, the evidence demonstrated that the sellers knew about the problems with the electrical system. Therefore, the elements of constructive fraud as set out by *Scott* are satisfied. As a result, we hold that the trial court's conclusion that the purchasers should recover under the theory of constructive fraud is not clearly erroneous. *See Scott,* 571 N.E.2d at 324.

We next consider whether the trial court properly determined the purchasers' remedy. In an action for fraud, the injured party is entitled to compensation for damage suffered as a result of the fraudulent representation. *Parke County v. Ropak, Inc.,* 526 N.E.2d 732, 739 (Ind.Ct.App.1988), *reh'g denied, trans. denied.* Generally, the rule for the measure of damages for fraud in the sale or exchange of property is the difference between the value of the property received by the party alleged to have been defrauded and the value of such property at the time, had it been as represented to be by the vender. *Johnson v. Naugle,* 557 N.E.2d 1339, 1343 (Ind.Ct.App.1990). Notwithstanding the general rule, in *Johnson,* we noted that other jurisdictions allow an alternative measure of damages for fraudulent concealment equal to the "cost of repairing the property to make it conform to the condition it would have had without defects." *Id.* (quoting *Posner v. Davis,* 76 Ill.App.3d 638, 32 Ill.Dec. 186, 395 N.E.2d 133, 138 (1979)). We also noted:

"If the injury is temporary in the sense that restoration can cure the harm, the reasonable cost of repair may serve the

need and provide adequate and fair compensation. If the damage is permanent and beyond full repair, the variance in the value of the property before and after injury often affords the better guide to a just award. It all depends upon the character of the property and the nature and extent of injury."

*Johnson,* 557 N.E.2d at 1343 (quoting *Cushman v. Kirby,* 148 Vt. 571, 536 A.2d 550, 554 (1987)). After approving this rule, we found that the injury in *Johnson* was temporary and, therefore, the reasonable cost of repair provided fair and adequate compensation to the plaintiffs. *Johnson,* 557 N.E.2d at 1343.

▮ Similarly, we find that the injury sustained by the purchasers in the instant case was temporary and that the reasonable cost of repair is the fair and adequate measure of damages. *See id.* The evidence, by Krysevig's testimony, indicated that it would cost $86,248 to bring the campground in compliance with the National Electric Code and to essentially cure the defect. By deciding to reduce the purchase price of the campground by the amount of Krysevig's estimate, the trial court inherently concluded that Krysevig's estimate was reasonable. Because the judgment is supported by evidence from the record, we cannot say that the trial court's decision is clearly erroneous. *See DeHaan,* 572 N.E.2d at 1320; *cf. Coffey v. Wininger,* 156 Ind.App. 233, 296 N.E.2d 154, 162 (1973) (holding that there was no evidence or inferences to be drawn from the evidence to support the damage award). Therefore, we hold that the trial court properly abated the purchase price of the campground.

### III.

The final issue raised for our review is whether the trial court properly awarded attorney fees in favor of the purchasers. After the purchasers rested their case, counsel for the purchasers offered a bill for services. Counsel argued that paragraph 10 of the

agreement authorized the award of attorney fees to the prevailing party. Paragraph 10 provides that "[t]he mortgage/land contract will contain the customary clauses found in standard mortgages/land contract—for this state." Record, p. 132. The agreement also indicated that it would be construed and enforced in accordance with the laws of the State of Indiana. Counsel argued that "customarily in contracts for the sale of real estate in Indiana you have the provision for the payment of attorney fees." Record, p. 297. However, counsel did not present any evidence in support of this assertion. The itemized bill for attorney fees totaled $8,372.33.

▮ The trial court accepted counsel's argument and awarded attorney fees to the purchasers in the amount of $8,372, reasoning that "a standard clause in Indiana in Indiana land contracts is that if a party to a contract/buy/sell agreement is forced to sue the other party, the non-prevailing party shall be responsible for and pay the prevailing party's attorney fees." Record, p. 111.

However, we find that the trial court erred by awarding attorney fees because counsel failed to present evidence of the customary clauses in Indiana land sale contracts. In fact, in their brief on appeal, the purchasers still have not identified authority to support their claim that the award of attorney fees is a customary clause in Indiana land sale contracts.[6]

Furthermore, we find such a claim to be beyond those matters of which the trial court may take judicial notice. Pursuant to Ind. Evidence Rule 201(a), a trial court may take judicial notice of a fact. "A judicially-noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably

---

6. In addition, the purchasers for the first time assert that "[t]he conduct of the Sellers in misrepresenting the condition of the campground at the time the Agreement was signed and the delay in setting a closing date was sufficient enough grounds upon which the Trial Court could award attorney fees." Appellees' brief, p. 18. This

argument was neither presented at trial nor considered by the trial court. Because this argument has not been previously raised, we will not address it at this time. *See Williams v. City of Indianapolis,* 558 N.E.2d 884, 887 (Ind.Ct.App. 1990), *trans. denied.*

be questioned." *Id.* Counsel has not alleged that his assertion satisfies the elements of a judicially noticed fact, and we find that it does not satisfy them. That attorney fees are customary clauses in Indiana land sale contracts has been established neither as a generally known fact within the trial court's jurisdiction nor as a fact capable of accurate and ready determination by sources whose accuracy cannot be reasonably questioned. Accordingly, we hold that the trial court erroneously awarded attorney fees to the purchasers.

In sum, we hold that the trial court properly awarded specific performance of the agreement and properly abated the purchase price of the campground. However, we hold that the trial court improperly awarded attorney fees and, therefore, we reverse that determination.

Affirmed in part and reversed in part.

RUCKER and RILEY, JJ., concur.