**James S. BITNER a/k/a Steve Bitner, Appellant–Respondent,**

v.

**Mary A. (Bitner) HULL, Appellee–Petitioner.**

No. 49A04–9706–CV–237.

Court of Appeals of Indiana.

June 9, 1998.

Sharon R. Merriman, Symmes, Voyles, Zahn, Paul & Hogan, Indianapolis, for Appellant–Respondent.

Sue Figert Meyer, R. Brock Jordan, Rubin & Levin, P.C., Indianapolis, for Appellee–Petitioner.

## OPINION

GARRARD, Judge.

### Case Summary

James Bitner ("Husband") appeals from a second amended Qualified Domestic Relations Order ("QDRO"). We affirm.

### Issues

Husband presents various issues which we consolidate and restate as follows:

I. Whether the trial court had jurisdiction to alter its decree of dissolution more than ninety days after the issuance of the decree; and,

II. Whether either of the following constituted a material change: the substitution of a percentage in place of a specific dollar judgment, and the addition of interest and/or earnings/losses to the judgment.

### Facts and Procedural History

In June of 1995, Mary Hull ("Wife") and Husband, accompanied by their respective counsel, attended their final dissolution hearing. The parties each presented evidence, argument, and proposed findings and conclusions regarding the division of property. In August of 1995, the trial court issued findings of fact, conclusions, and a decree of dissolution. According to that order, Wife was to receive *inter alia:*

| | |
|---|---|
| Thrift Equity | $52,000.00 |
| RSR Thrift Equity Fund | $15,049.00 |
| Total | $67,049.00 |

Record at 23.

In March of 1996, Wife filed a petition with the trial court to "clarify dissolution of marriage decree, enforce dissolution of marriage decree and correct clerical errors." Record at 26. In her petition, Wife stated that neither the thrift equity nor the RSR thrift equity fund money had been turned over to her. She also asserted:

RSR ... refuses to offer any cooperation to Wife's counsel, Husband refuses to authorize Wife's counsel to obtain information about the account so an appropriate Qualified Domestic Relations Order ("QDRO") can be drafted, and there are issues relating to appreciation on the funds

awarded to Wife, which Husband refuses to allow Wife to have.

Record at 29. Also within the petition, Wife asked that the trial court issue a QDRO after a hearing.

Husband's response to Wife's petition provided:

D. [Husband] has no objection to a QDRO being issued after a hearing. At all times, attorney for [Wife] has been advised to prepare a QDRO.

E. [Husband] would object to any appreciation, interest and earnings being distributed to Wife inasmuch as the Decree awards Wife a set sum, not an account.

Record at 63. On March 15, 1996, the trial court ordered RSR to respond to interrogatories by April 4 and to refrain from disbursing to Husband any part of the equity fund. An April 1, 1996 letter from the plan administrator to Wife's and Husband's respective attorneys stated that "no disbursement will be made absent receipt of a [QDRO]." Record at 81. A June 6, 1996 letter from the plan administrator indicated that responses to the interrogatories would not be available until perhaps later that month. On June 20, 1996, Wife filed a petition for rule to show cause against RSR based upon its refusal to provide her with the requested information.

In October of 1996, the trial judge entered a QDRO. In December of that same year, Wife filed a motion to amend the QDRO due to problems raised by the plan administrator in a November, 1996 letter. The plan administrator had issued an opinion that the QDRO did not meet federal law because it failed to specifically list the amount or percentages to be paid by the plan as of the most recent valuation date immediately preceding the date of receipt of the QDRO by the administrator. Record at 109–12. Wife then filed an amended QDRO utilizing the plan administrator's suggestions as a guide. Specifically, the amended QDRO provided that Wife was entitled to receive 95% of the equity fund and that Husband was entitled to receive 5% of the equity fund. The court entered the amended QDRO on April 25, 1997. The following day, the court entered a

second amended QDRO.[1] Husband filed a motion to correct errors which was denied.

### Discussion and Decision

#### I. Jurisdiction

Husband contends the trial court lacked jurisdiction to alter its decree of dissolution because more than ninety days had passed since the decree had been issued. As authority, Husband relies upon the following provision: "All courts shall retain power and control over their judgments for a period of ninety [90] days after the rendering thereof in the same manner and under the same conditions as they heretofore retained such power and control during the term of court in which the judgments were rendered." IND.CODE § 33-1-6-3.

We are unpersuaded by Husband's argument for a variety of reasons. First, in Husband's response to Wife's petition to enforce/clarify the decree, Husband admitted that at all times, Wife's attorney had been advised to prepare a QDRO. Thus, the QDRO came as no surprise to Husband. Second, within the same response, Husband also explicitly stated that he had no objection to a QDRO being issued after a hearing. As such, Husband has waived any objection to the timing (more than ninety days after the decree) of the original QDRO.

Third, "[c]ourts of this State have long had power, both inherent and statutory, to entertain actions to determine whether a judgment has been carried out and satisfied." *Wilson v. Wilson,* 169 Ind.App. 530, 349 N.E.2d 277, 279 (1976). The inherent power of our courts to issue orders to assist in the enforcement of their judgments was recognized in *Wabash Railway Co. v. Todd,* 186 Ind. 72, 113 N.E. 997 (1916). In that case, Wabash was ordered to begin constructing a bridge on November 22, 1911. On January 10, 1916, more than four years later, a petition was filed seeking an order setting a completion date and alleging the refusal of the railroad to build the bridge. Our su-

preme court held that the trial court had jurisdiction and stated:

> [The petition] sought only the entry of an order supplementary to, and fixing the time within which [railroad] should comply with a previous order in the proceeding *and thus invoked the exercise of an inherent power which a court possesses to make such orders and to issue such writs as may be necessary and essential to carry a previous judgment into effect and render it binding and operative.*

186 Ind. at 78, 113 N.E. at 998 (emphasis added).

Here, Wife was awarded both the thrift equity and the RSR thrift equity fund money, yet none of it had been turned over to her. In addition, RSR refused to offer any cooperation to Wife's counsel, and Husband refused to authorize Wife's counsel to obtain information about the account so an appropriate QDRO could be drafted. Unless the court took action, its decree would not be heeded. Thus, as in *Wabash,* the trial court exercised its inherent power to make such orders as were necessary to enforce its prior decree. Specifically, the court examined Wife's petition to clarify/enforce, ordered the issuance of interrogatories, and eventually entered a QDRO.

Rather than being an alteration of the dissolution decree, Wife's petition was merely an enforcement mechanism, neither objected to on the basis of its timing nor unexpected. Accordingly, we conclude that the trial court had jurisdiction in this matter despite the fact that more than ninety days had elapsed since the date of the decree.

#### II. Material Change

In a related argument, Husband asserts that the trial court made the following improper material changes in the amended and second amended QDRO: the substitution of a percentage in place of a specific dollar judgment, and the addition of interest and/or earnings/losses to the judgment. In support, he cites *Mitchell v. Stevenson,* 677 N.E.2d 551 (Ind.Ct.App.1997), *trans. denied.*

---

1. The second amended QDRO is essentially the amended QDRO with minor changes not relevant for our resolution of this case.

■ In *Mitchell,* we stated: "After entering an agreed judgment, the trial court has no authority to modify or change the judgment in any essential or material manner." *Id.* at 565. We acknowledge that strong policy favors finality of marital property divisions, whether a court approves the terms of a settlement agreement reached by parties or the court divides the property. *See Dusenberry v. Dusenberry,* 625 N.E.2d 458, 461 (Ind.Ct.App.1993). However, the court retains equitable authority to modify the division of marital property. *See id.* We examine whether the trial court's actions here changed its decree in any essential or material manner.

■ The decree awarded Wife the entire $67,049 equity fund as of February 22, 1995, the date of separation. The decree broke down the award of the fund into two parts: (1) $52,000, representing the post-tax dollars, and (2) $15,049, representing pre-tax dollars. After February 22, Husband made contributions of approximately $3,423 to the fund. Record at 106. Pension benefits accumulated after the date of final separation should not be included in the marital pot. *Waggoner v. Waggoner,* 531 N.E.2d 1188, 1189 (Ind.Ct.App.1988). Hence, Husband was entitled to the portion of the fund accumulated after the date of separation. As such, the trial court's first QDRO specifically stated that Wife was to receive approximately $67,049, "including any accrued interest or earnings thereon until the date of distribution to [Wife], *excluding* any contribution to the 'Equity Fund' after 2/22/95 and any interest or earnings or losses on said contribution." Record at 100 (emphasis added).

In response to the plan administrator's opinion that the QDRO did not meet federal law because it failed to specifically list the amount or percentages to be paid by the plan as of the most recent valuation date immediately preceding the date of receipt of the QDRO by the plan administrator, Wife filed an amended QDRO which the court initially approved. In the amended QDRO, Wife used the plan administrator's suggestions as a guide to drafting. Specifically, she added Wife's portion of the equity fund ($67,049) to the amount Husband had contributed after February 22 ($3,423). She then divided $67,049 by the sum ($70,472) to calculate her percentage of the fund (95%). Similarly, she divided $3,423 by the sum to determine Husband's percentage share of the fund (5%).[2] In addition, each party was awarded the "accrued interest or earnings thereon or losses thereon from the most recent valuation date immediately preceding the date of the Order by the Plan Administrator." Record at 141.

Wife met with strong resistance when she originally attempted to collect the equity fund money due her under the decree. By the time Wife was finally in a position to collect, Husband had contributed more money into the fund and many months had passed. Had the trial court not excluded Husband's portion from Wife's award, Wife would have received more than the decree allocated or the law allows. *See Waggoner,* 531 N.E.2d at 1189. Likewise, had the trial court not specified that interest, earning, and losses were to be factored into each party's award, neither Wife nor Husband would have received a proper award. *See also DeHaan v. DeHaan,* 572 N.E.2d 1315, 1328 (Ind.Ct.App.1991) (noting that trial court has discretion to decide whether to award interest when marital property division payments are deferred), *trans. denied.* In summary, we conclude that the changes made in the amended QDRO are not improper modifications; that is, those which change the judgment in any essential or material manner.

Affirmed.

HOFFMAN and STATON, JJ., concur.

---

2. We also note that a percentage method is permitted by Ind Code § 31–15–7–4(b)(4), which states that in dividing property, the court shall order the distribution of benefits that are payable after the dissolution of marriage, by setting aside to either of the parties a percentage of those payments either by assignment or in kind at the time of receipt.