KAGHANN'S KORNER, INC., Appellant,

v.

BROWN & SONS FUEL COMPANY, INC., Appellee.

No. 17A03–9802–CV–79.

Court of Appeals of Indiana.

Feb. 25, 1999.

John R. Burns, III, Robert D. Moreland, Laura C. O'Donnell, Baker & Daniels, Fort Wayne, Indiana, Attorneys for Appellant.

Cathleen M. Shrader, Thomas A. Herr, Barrett & McNagny, Fort Wayne, Indiana, Attorneys for Appellee.

## OPINION

RILEY, Judge

### STATEMENT OF THE CASE

Defendant–Appellant Kaghann's Korner, Inc. appeals two trial court decisions: 1) "Court Decision Enforcing Contract for Sale of Real Estate" ("Contract Decision"), ordering Kaghann's Korner to specifically perform its obligations required by an enforceable agreement for the sale of Kaghann's Korner's real estate and business to Brown & Sons Fuel Company, Inc. ("Brown"); and 2) "Court Decision Awarding a Civil Money Judgment for Damages Based on Negligence" ("UST Decision"), finding that Brown negligently caused a fuel spill at Kaghann's Korner's underground storage tank ("UST"), but failing to find that Brown violated the Indiana Underground Storage Tank Act ("USTA"). Ind.Code § 13–23 et seq.

Plaintiff–Appellee Brown cross-appeals on the "Court Decision Establishing Partial Summary Judgment" in favor of Kaghann's Korner and against Brown, finding that Brown failed to strictly perform its implied contractual obligations to deliver diesel fuel to Kaghann's Korner in a safe, reasonable, and workmanlike manner, thereby committing a breach of contract.

We affirm in part and reverse in part.

### ISSUES

Kaghann's Korner raises three issues for our review which we restate as follows:

1. Whether the trial court erred in finding that Brown was not an owner or operator of the UST as defined under the USTA at the time of the fuel overfill.[1]

2. Whether the trial court erred in determining that Brown did not cause a release of fuel as defined under the USTA.[2]

3. Whether the trial court correctly ordered Kaghann's Korner to specifically perform its obligations required by the January 18, 1995 Letter of Understanding ("Letter").

4. Whether the trial court lacked jurisdiction to enter its January 15, 1998 order subsequent to its original August 11, 1997 judgments.

Brown raises one issue on cross-appeal for our review which we restate as: whether the trial court erred in finding that as a matter of law Brown failed to strictly perform its contractual obligations, thereby committing a breach of contract.

### FACTS AND PROCEDURAL HISTORY

On January 18, 1995, Kaghann's Korner and Brown entered into a contract for the sale of the Kaghann's Korner business and real estate. This contract included the Letter, a Promissory Note (Note), a Commercial Realty Lease (Lease), and a Fuel Supply Agreement (Agreement). The Letter stated a purchase price of $335,000 with a $50,000 cash down payment due from Brown at closing. The Note was for the remaining $285,000 and called for 120 consecutive monthly payments of principal and interest of $3,458 at eight percent per annum for ten years. The Lease was an agreement whereby Kaghann's Korner, as tenant, was to pay Brown, as landlord, the sum of $40,200 per annum, payable in equal monthly installments of $3,350. The Agreement was for Kaghann's Korner to purchase all fuel product requirements from Brown in order to guarantee Kaghann's Korner a pre-established margin for each fuel grade. Brown paid to Kaghann's Korner the $50,000 down payment at closing. Kaghann's Korner has continued to possess the real estate and operate the business but has failed to pay to Brown any of the $3,350 monthly lease payments agreed to in their Lease and has failed to obtain title insurance and deliver a warranty deed.

On March 30, 1995, Jay E. Brown, on behalf of Brown & Sons Fuel, delivered a truckload of diesel fuel to Kaghann's Korner. However, while in the process of filling a 4,000 gallon UST at Kaghann's Korner and while not paying attention, Jay E. Brown caused an overfill of the tank resulting in diesel fuel being spilled onto the concrete

---

1. Ind.Code §§ 13–11–2–150, 13–11–2–148(d).

2. Ind.Code § 13–11–2–184(a).

surface in the area and onto and into the ground in the area.

On March 25, 1996, the Dekalb County Circuit Court entered its "Decision Establishing Partial Summary Judgment" in favor of Kaghann's Korner and against Brown for spilling diesel fuel on the property, thereby constituting a breach of an implied contract term of the fuel supply contract that the fuel be delivered in a safe, reasonable, and workmanlike manner using reasonable care.

On August 11, 1997, the Dekalb County Circuit Court entered two judgments. First, in the "Court Decision Enforcing Contract for Sale of Real Estate," the trial court ordered Kaghann's Korner to specifically perform its obligations required by the January 18, 1995 Letter, including the implied obligation to deliver to Brown a warranty deed and title insurance coverage. Further, the order bound Brown by the terms of the Note and both parties remained bound by the terms of the Lease. The second order was the "Court Decision Awarding a Civil Money Judgment for Damages Based on Negligence," whereby the trial court entered a judgment in favor of Kaghann's Korner and against Brown for $62,929.81 together with court costs and statutory judgment interest from and after August 11, 1997.

On January 15, 1998, the trial court entered a judgment pursuant to Indiana Trial Rule 70, ordering the money judgment funds from the August 11, 1997 judgment to be held in escrow for the sole purpose of cleaning up the environmental damage done by the fuel overfill at Kaghann's Korner.

Kaghann's Korner appeals the January 15, 1998 judgment as well as the two August 11, 1997 judgments while Brown appeals the March 25, 1996 judgment.

## DISCUSSION AND DECISION
### I. *Owner or Operator*

Kaghann's Korner argues that the trial court erred in finding that Brown did not own or operate the USTs and therefore was not liable under the USTA. Specifically, Kaghann's Korner contends that Brown is liable under the Act because it was both an owner and an operator of the USTs at the time of the fuel spill.

In order for a party to be held liable for costs under the USTA, it must be shown that the party either "owned or operated the underground storage tank at the time" when the fuel overfill occurred. Ind.Code § 13–23–13–8(b).

### A. *Owner*

Kaghann's Korner argues that Brown owned the USTs at the time the fuel overfill occurred because the trial court found that Kaghann's Korner and Brown entered into an enforceable contract for the sale of Kaghann's Korner. According to the USTA, the definition of "owner" is a person who owns the underground storage tank, but specifically does not include a person who does not participate in the management of a UST, is otherwise not engaged in the production, refining, and marketing of regulated substances, and holds indicia of ownership primarily to protect the owner's security interest in the tank. Ind.Code § 13–11–2–150.

■ The supreme court, in *Skendzel v. Marshall*, held that a conditional land sale contract, once consummated, constitutes a present sale and purchase of the property, with the seller retaining the legal title of the property as security for the performance of the contract while equitable title vests in the purchaser. 261 Ind. 226, 301 N.E.2d 641, 646 (1973). Once the parties enter into a contract for the sale of real estate, all incidents of ownership accrue to the purchaser and the purchaser assumes the risk of loss. *Id.* Therefore, the retention of the title by the seller is the same as reserving a lien or mortgage. Realistically, seller-purchaser should be viewed as mortgagee-mortgagor. *Id.* In *Skendzel*, the Court reasoned that a conditional land sale contract, where the vendor reserves title, in effect creates a vendor's lien in the property to secure the unpaid balance owed under the contract. *Id.* at 647.

■ However, under the line of reasoning of *Skendzel*, the contract between Kaghann's Korner and Brown for the sale of Kaghann's Korner cannot be viewed as a mortgage. The contract between Brown and Kaghann's Korner was not a conditional land sale con-

tract because the parties orally agreed that title insurance and a warranty deed would be executed and delivered to Brown within a few days of the consummation of the contract. Further, Brown fulfilled its part of the bargain by paying a $50,000 down payment and executed and delivered an unsecured promissory note for $285,000. Therefore, unlike the facts in *Skendzel*, Brown had no more conditions to perform under the contract and the Agreement was simply a contract for the sale of real estate. On the other hand, Kaghann's Korner was not retaining title as security for Brown to pay the remaining balance of the contract because there was no remaining balance. Instead, Kaghann's Korner had failed to honor its obligation to deliver title insurance and the deed within a reasonable time of the consummation of the contract. Although the trial court determined that the contract between Brown and Kaghann's Korner was enforceable, we cannot find that Brown was the owner of Kaghann's Korner at the consummation of the contract.

We conclude, therefore, that Brown was not the owner of Kaghann's Korner under the USTA because the contract was not akin to a mortgage. Where the title is retained by the seller as security for the payment of the debt, the security is very generally regarded as possessing all the essential features of a mortgage, and the seller stands in the shoes of a mortgagee to the buyer. *Skendzel*, 301 N.E.2d at 647. Where a sale of land is evidenced by a contract only, and the purchase price has not yet been paid, and the seller retains legal title, the parties occupy the positions of mortgagor and mortgagee. *Id.* Although Brown had satisfied its conditions of the contract, title had not been passed to Brown. Further, Kaghann's Korner was still in possession and operating the Kaghann's Korner business at the time of the fuel overfill. Thus, although the contract for the sale of Kaghann's Korner was enforceable, title and possession, and therefore ownership, had yet to pass to Brown. We affirm the trial court's ruling that Brown was not an owner under the USTA.

## B. *Operator*

Next, Kaghann's Korner argues that the trial court erred by failing to find that Brown was an operator of the UST at the time of the fuel overfill. Specifically, Kaghann's Korner contends that Brown was an operator of the UST because Brown was accountable for the daily operations of the UST as a result of the exclusive fuel supply agreement between Brown and Kaghann's Korner. According to the USTA, an operator is defined as "a person in control of, or having responsibility for, the daily operations of an underground storage tank." Ind.Code 13–11–2–148(d).

When construing a statute, we are guided by several rules of statutory construction. First, when a statute is clear and unambiguous on its face, the court need not, and indeed must not, interpret the statute. *State v. Livengood by Livengood*, 688 N.E.2d 189, 193 (Ind.Ct.App.1997). Rather, we give the statute its plain and clear meaning. *Skrzypczak v. State Farm Mut. Auto. Ins.*, 668 N.E.2d 291, 295 (Ind.Ct.App.1996). Additionally, when construing a statute, the legislature's definition of a word binds us. When the legislature has not defined a word, we give the word its common and ordinary meaning. *Id.* In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries. *Ashlin Transp. Servs., Inc. v. Indiana Unemployment Ins. Bd.*, 637 N.E.2d 162, 167 (Ind.Ct.App.1994).

The definition of "control" is "to exercise restraining or directing influence over." Webster's Third New International Dictionary (1976) p. 496. Thus, in determining whether Brown was in control of the daily operation of the UST at Kaghann's Korner, we must determine whether Brown was exercising restraining or directing influence over the daily operation of the UST at Kaghann's Korner.

The facts indicate that Brown did have some level of influence over the UST in question at Kaghann's Korner. For instance, Brown and Kaghann's Korner contracted for Brown to be the exclusive supplier of fuel for Kaghann's Korner. Therefore,

Brown was the only fuel supplier that had the authority to fill the UST. Brown's employees routinely measured and monitored the level of fuel in the UST in order to determine a delivery amount. Further, it was not necessary for Brown to get permission from Kaghann's Korner in order to fill the USTs at Kaghann's Korner. However, Brown did not exert influence over all aspects of the UST at Kaghann's Korner as the definition of "control" implies. Instead, Kaghann's Korner's on-site personnel had daily or regular contact with the UST. In fact, Kaghann's Korner's employees also routinely monitored and maintained records of the level of fuel in the UST, frequently calling on Brown to make irregular deliveries. We cannot say that Kaghann's Korner has shown that Brown actually exercised control or influence over the daily operation of the UST at Kaghann's Korner. Thus, Brown does not fall within the "control" part of the definition of operator. We will now analyze the "responsibility" prong.

"Responsible" has been defined as "answerable" or "accountable." Webster's Third New International Dictionary (1976) p.1935. Therefore, in determining whether Brown had responsibility for the daily operation of the UST at Kaghann's Korner, we ask whether Brown was accountable or answerable for the daily operation of the UST. Recently, our Supreme Court examined the term "operator," basing liability under the USTA on the "responsibility for the daily operation" prong of the definition. *Shell Oil Co. v. Meyer*, 705 N.E.2d 962 (Ind.1998). In that case, the court first found that "[a]lthough the Act does not require interaction with the tank literally each day, 'daily' implies at least some continuous level of activity . . . [and] 'daily operations' [are] activities routinely associated with the use of the tank, includ[ing] filling it, dispensing gasoline from it and measuring its contents." *Id.* at 972–73. Further, the court determined that "responsibility for the daily operation" and therefore status as an "operator" of a UST was based upon "(1) what constitutes the daily operation of the tanks, (2) who did these things, (3) in what capacity that person was acting and (4) who is responsible for that person's actions in that capacity." *Id.* at 977.

The court reasoned that the USTA does not require that an operator have responsibility for every aspect of the daily operations of the UST. Instead, the court found it to be sufficient to engage in at least two principal tasks with respect to a UST in order to be responsible for the daily operation of an underground storage tank. *Id.* at 979–80. In that case, the court found Shell Oil Company liable as an operator because its employee (Smith) "maintained a high frequency of contact with the station and the underground storage tanks." *Id.* at 979. Smith's responsibilities included measuring and monitoring the level of inventory in the tanks, and filling the tanks.

Similarly, in our case, Brown maintained a high level of contact with the UST at Kaghann's Korner, routinely engaging in at least two principal tasks performed with respect to the UST. The evidence reveals that Brown measured and monitored the USTs at Kaghann's Korner and also filled the tanks with fuel without the necessity for Brown to get permission from Kaghann's Korner in order to do so. Further, Brown was acting in the capacity of the only fuel supplier that had authority to fill the UST.

The fact that Kaghann's Korner's employees also routinely monitored and maintained records of the level of fuel in the UST is of no matter because "there could be more than one operator of a tank at the same time: those who 'control' the on-site personnel who have daily or regular contact with the tank, and those who have 'responsibility' for those activities." *Id.* at 974. We find that while Kaghann's Korner had both control and responsibility over the daily operation of the UST, Brown had responsibility for the daily operation of the UST. Thus, the trial court erred in finding that Brown was not an operator under the USTA because Brown routinely maintained a continuous level of activity associated with the UST at Kaghann's Korner, engaging in at least two principal tasks performed in order to have responsibility for the daily operation of the UST at Kaghann's Korner.

## II. *Release*

■ In order for Brown to be held liable under the USTA, Brown not only must be

either an owner or operator under the USTA, but Brown must have also caused a release from the UST. *See* Ind.Code § 13–23–13–8. Kaghann's Korner claims that the trial court erred in finding that Brown's fuel overfill did not constitute a "release" pursuant to the USTA. Specifically, Kaghann's Korner argues that the definition of "underground storage tank" and "release" under the USTA dictates a finding that Brown caused a release of fuel when it overfilled the UST at Kaghann's Korner on March 30, 1995.

According to the USTA, an "underground storage tank" is "one (1) tank or a combination of tanks, including underground pipes connected to the tank or combination of tanks." Ind.Code § 13–11–2–241(a). A "release" for purposes of the USTA, means any "spilling, leaking, emitting, discharging, escaping, leaching, or disposing." Ind.Code § 13–11–2–184(a).

The record reveals that fuel escaped from both the fill pipe located on top of the UST as well as the underground vent pipes connected to the UST, but emptied at the retaining wall between the upper and lower level of Kaghann's Korner. Thus, based upon the definition of a UST, which includes underground pipes connected to the UST, we conclude that Brown caused a release of fuel when fuel escaped from the vent pipes. We find that the trial court erred in finding that Brown did not cause a release of fuel on March 30, 1995 at the UST at Kaghann's Korner.

Therefore, we reverse the trial court's ruling and conclude that Brown was an operator under the USTA and was responsible for a release, thereby making them liable under the USTA.

### III. *Specific Performance*

Kaghann's Korner argues that the trial court erred by improperly ordering specific performance of its agreement with Brown. Specifically, Kaghann's Korner contends that the trial court failed to properly construe the parties' agreement in its entirety, including the Letter, Note, Lease, and Fuel Supply Agreement.

■ It is a matter of course for a trial court to grant specific performance of a valid contract for the sale of real estate. *Stoll v. Grimm,* 681 N.E.2d 749, 756 (Ind.Ct.App. 1997). A contract for the sale of property need only be reasonably definite and binding as to its material terms to enforce by specific performance. *Donavan v. Ivy Knoll Apts. Partnership,* 537 N.E.2d 47, 53 (Ind.Ct.App. 1989). A court's order of specific performance must, as nearly as possible, cause a contract to be performed in accordance with its terms. *Bohlin v. Jungbauer,* 615 N.E.2d 438, 439 (Ind.Ct.App.1993). The decision whether to grant specific performance is a matter within the trial court's sound discretion. *Ridenour v. France,* 442 N.E.2d 716, 718 (Ind.Ct.App.1982). We will reverse only upon a showing that the trial court abused its discretion. *Claise v. Bernardi,* 413 N.E.2d 609, 612 (Ind.Ct.App.1980). A decision is an abuse of discretion if it is clearly against the reasonable deductions which may be drawn from the facts and circumstances before the court. *Id.*

■ In the present case, the trial court found that the parties entered into a valid and enforceable contract for the sale of Kaghann's Korner and ordered specific performance. Specifically, the trial court found that:

> Because the January 18, 1995 contract is for the sale and purchase of a specific parcel of real property a remedy of money damages in favor of Brown & Sons Fuel is inadequate. Kaghann's Korner is hereby ordered to specifically perform its obligations required by the January 18, 1995 Letter of Understanding. . . .

(R. 429). The evidence before the trial court indicated that the parties entered into a written contract for the sale of Kaghann's Korner. Brown made a down payment of $50,-000 at closing and agreed to a $285,000 promissory note calling for payments of principal and interest at eight percent for ten years. The parties also agreed to enter into a lease agreement, calling for monthly payments equal to one percent of Brown's total investment into Kaghann's Korner, whereby Brown leases Kaghann's Korner back to Kaghann's Korner. They also agreed to enter

into a fuel supply agreement whereby Kaghann's Korner agreed to purchase all fuel product requirements from Brown. This evidence describes an agreement that is reasonably definite and binding as to its material terms, and we cannot say that the agreement is so uncertain that a reasonable interpretation is impossible. Therefore, we conclude that the trial court properly awarded specific performance.

### IV. *Jurisdiction*

Kaghann's Korner argues that the trial court lacked jurisdiction to enter its January 15, 1998 order requiring that the $65,094.84 money judgment payment pursuant to the August 11, 1997 judgment be placed in an escrow account and used for the purpose of remedying the environmental damage done to Kaghann's Korner. Specifically, Kaghann's Korner contends that the trial court substantively modified the original judgments of August 11, 1997 without any authority to do so. As authority, Kaghann's Korner relies upon the following provision: "All courts shall retain power and control over their judgments for a period of ninety [90] days after the rendering thereof in the same manner and under the same conditions as they heretofore retained such power and control during the term of court in which the judgments were rendered." Ind.Code § 33–1–6–3.

 We disagree with Kaghann's Korner's reasoning. First, the trial court's January Order was entered "pursuant to the spirit of Indiana Trial Rule 70 and the inherent and equitable powers of this Court to see that its own judgments and orders are enforced...." (Supp. R. 54). Thus, the trial court did not enter the order pursuant to Ind.Code § 33–1–6–3, but instead pursuant to its inherent powers as well as Ind. Trial Rule 70. Furthermore, our courts have repeatedly held that in the event of a conflict between a procedural statute such as Ind. Code § 33–1–6–3, and a procedural rule adopted by the supreme court, such as T.R. 70, the latter shall take precedence. *Anderson v. Horizon Homes, Inc.*, 644 N.E.2d 1281, 1288 (Ind.Ct.App.1995). Second, courts of this state have long had power,

both inherent and statutory, to entertain actions and issue orders to assist in the enforcement of their judgments. *Bitner v. Hull*, 695 N.E.2d 181, 183 (Ind.Ct.App.1998).

Kaghann's Korner argues that the trial court's August 11, 1997 order did not specifically require that the money judgment be held in an escrow account for the sole purpose of cleaning up the environmental damage caused by Brown. Thus, Kaghann's Korner contends that the trial court substantially modified its order when it required the money to be held in an escrow to ensure that the specific performance of cleanup was completed. However, pursuant to the Letter of Understanding between Kaghann's Korner and Brown, Kaghann's Korner agreed to bear all costs for environmental cleanup on the premises. Thus, we conclude that the trial court's January 18, 1998 order was neither contrary nor extra jurisdictional to the August 11, 1997 order and was pursuant to the trial court's inherent power to enforce its judgment.

### *Breach of Contract*

Brown argues on cross-appeal that the trial court erred in entering summary judgment in favor of Kaghann's Korner and against Brown for breaching the Fuel Supply Agreements between the parties. Specifically, Brown contends that the fuel spill caused by Brown on March 30, 1995 was not sufficient to constitute a breach of contract as a matter of law. The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Monon Corp. v. Townsend*, 678 N.E.2d 807, 809 (Ind. Ct.App.1997), *trans. denied, reh'g denied.* Summary judgment is appropriate when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). The movant bears the burden of establishing the propriety of summary judgment, and all facts and inferences to be drawn therefrom are viewed in the light most favorable to the non-moving party. *Ramon v. Glenroy Constr. Co.*, 609 N.E.2d 1123, 1127 (Ind.Ct. App.1993).

 When reviewing a decision upon a motion for summary judgment, this court is bound by the same standard as the trial

court. *Webb v. Jarvis*, 575 N.E.2d 992, 994 (Ind.1991). We stand in the shoes of the trial court and liberally construe all designated evidentiary material in favor of the non-moving party. *Rotec, Div. of Orbitron, Inc. v. Murray Equip. Inc.*, 626 N.E.2d 533, 535 (Ind.Ct.App.1993). We may only consider those parts of the pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and other matters which have been designated by the parties to the trial court for consideration. T.R. 56(C); *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). In order to prevail on appeal when a summary judgment motion has been granted in favor of an opposing party, the appealing party must establish the existence of a genuine issue of material fact from the designated materials. *Thompson v. Murat Shrine Club, Inc.*, 639 N.E.2d 1039, 1040 (Ind.Ct.App.1994). Where the facts are not in dispute, summary judgment is inappropriate only when the fact finder may reasonably draw conflicting inferences from the undisputed facts. *Nobles v. Cartwright*, 659 N.E.2d 1064, 1071 (Ind.Ct. App.1995). When the language of a written contract is not ambiguous, its meaning is a question of law for which summary judgment is particularly appropriate. *Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind.Ct.App.1992). In interpreting an unambiguous contract, we give effect to the intentions of the parties as expressed in the four corners of the instrument. *Hyperbaric Oxygen Therapy Systems, Inc. v. St. Joseph Medical Center of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind.Ct. App.1997), *trans. denied.* Clear, plain, unambiguous terms are conclusive of that intent. *Id.* We will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties. *Id.*

■■■■ On January 18, 1995, Brown and Kaghann's Korner entered into a written Fuel Supply Agreement whereby Kaghann's Korner agreed to purchase all of its petroleum products from Brown to be delivered to Kaghann's Korner's place of business. On March 30, 1995, while delivering fuel, Brown was responsible for spilling 120 gallons of fuel at Kaghann's Korner's place of business. The trial court concluded that no genuine issue of material fact existed as to whether Brown strictly performed its implied contractual obligation to deliver the diesel fuel in a safe, reasonable, and workmanlike manner, thereby committing a breach of contract. The trial court based its summary judgment decision on the common law duty accompanying every contract to perform the thing agreed to be done with care, skill, and faithfulness. *Crum v. AVCO Financial Services of Indianapolis, Inc.*, 552 N.E.2d 823, 827 (Ind.Ct.App.1990). Indeed, it has long been the rule in Indiana that one who undertakes by contract to perform a service not only owes a duty of diligence to his contracting counterpart but also owes a general duty to perform the service with reasonable care. *Id.* Further, the trial court found that Brown had not presented any specific allegation in the record to create a genuine issue as to whether the cause of the fuel spill was something other than Brown's conduct. Thus, we conclude that the trial court properly granted summary judgment in favor of Kaghann's Korner and against Brown for breaching the Fuel Supply Agreement.

## CONCLUSION

The trial court did not err in finding that Brown was not an owner of the UST as defined under the USTA at the time of the fuel overfill. However, the trial court erred in finding that Brown was not an operator at the time of the fuel overfill. Thus, we reverse the trial court's judgment on the issue of Brown's liability under the USTA because Brown was an operator of the UST at Kaghann's Korner at the time of the fuel overfill. The trial court correctly ordered Kaghann's Korner to specifically perform its obligations required by the January 18, 1995 Letter of Understanding. The trial court did not lack jurisdiction to enter its January 15, 1998 order subsequent to its original August 11, 1997 judgments. The trial court did not err in finding that as a matter of law Brown failed to strictly perform its contractual obligations, thereby committing a breach of contract.

Affirmed in part and reversed in part.

STATON, J., and BROOK, J., concur.