SHELL OIL COMPANY, Union Oil Company, Appellants/Cross Appellees, (Defendants Below),

v.

Richard and Kim MEYER, Gary and Bridget McDaniel, Jim and Terri McDonald, Dan and Vivian McDaniel, Alvin and Verna Mae Casad and Helena Byers, Appellee/Cross Appellants (Plaintiffs Below).

No. 79S04–9801–CV–043.

Supreme Court of Indiana.

Dec. 30, 1998.

Rehearing Denied April 16, 1999.

Karl L. Mulvaney, Nana Quay–Smith, Larry J. Kane, Phil L. Isenbarger, Bingham Summers Welsh & Spilman, James A. Knauer, Gregory P. Cafouros, Marcia E. Roan, Kroger, Gardis & Regas, Indianapolis, Indiana, Attorneys for Appellants.

Robert S. Bassman, Alphonse M. Alfano, G. William Frick, M. Elizabeth Cox, Thomas Sayre Llewellyn, American Petroleum Institute, Indiana Oil Marketers Association, Washington, DC, Frank C. Capozza, American Petroleum Institute, Indiana Oil Marketers Association, Lewis E. Willis, Jr., Indiana Oil Marketers Association, Indianapolis, Indiana, Attorneys for Amici Curiae.

Randall Vonderheide, Steven R. Knecht, Lafayette, Indiana, Robert M. Baker III, Thomas A. Barnard, Melina Maniatis Kennedy, Peter M. Racher, Jeffrey D. Featherstun, Thomas A. John, Indianapolis, Indiana, Attorneys for Appellees.

Jeffrey A. Modisett, Attorney General of Indiana, Jon Laramore, Indianapolis, Indiana, Thomas J. Miller, Attorney General of Iowa, Dean A. Lerner, Des Moines, Iowa, Winston Bryant, Attorney General of Arkansas, Little Rock, Arkansas, M. Jane Brady, Delaware Attorney General, Wilmington, Delaware, Grant Woods, Attorney General of Arizona, Phoenix, Arizona, Peter Lehner, Erik Olson, William E. Dornbos, Natural Resources Defense Council, Inc., New York, New York, Dimitri G. Daskal, National Coalition of Petroleum Retailers, Annapolis, Maryland, Mark R. Waterfill, National Coalition of Petroleum Retailers, Eric L. Mayer, Max Goodwin, Hoosier Environmental Council, Sue A. Beesley, Sheila M. O'Bryan, City of Indianapolis, Jane A. Seigel, Indiana Association of Cities and Towns, Indianapolis, Indiana, Frank Shafroth, National League of Cities, Washington, DC, Peter Gunst, Service Station Dealers of America, Baltimore, Maryland, Gus F. Diaz, Acting Attorney General of Guam, Agana, Guam, Margery S. Bronster, Attorney General of Hawaii, Honolulu, Hawaii, Hubert H. Humphrey III, Attorney General of Minnesota, St. Paul, Minnesota, Dennis C. Vacco, Attorney General of New York, Albany, New York, William H. Sorrell, Attorney General of Vermont, Montpelier, Vermont, James E. Ryan, Attorney General of Illinois, Chicago, Illinois, Tom Udall, New Mexico Attorney General, Santa Fe, New Mexico, Jan Graham, Utah Attorney General, Salt Lake City, Utah, Richard Blumenthal, Attorney General of Connecticut, Hartford, Connecticut, Attorneys for Amici Curiae.

## ON PETITION TO TRANSFER

BOEHM, Justice.

This case deals with the liability of refiners under Indiana's Underground Storage Tank

Act (the "Act") for costs of corrective actions for leaks in tanks at retail gasoline stations owned by independent retailers. Specifically the principal issue presented is under what circumstances a major oil company is an "operator" of underground storage tanks located at an independent station that bears its brand. The term "operator" is defined in the Act to mean persons "in control of or having responsibility for the daily operation" of a tank. IND.CODE § 13–11–2–148 (1998). We hold that a refiner, such as the defendants Shell Oil Company ("Shell") and Union Oil Company of California ("Unocal"), is not an operator of an independent station bearing its brand merely because the refiner's brand creates practical leverage over the station's owner or operator. However, under the facts of this case we affirm the trial court's conclusion that Shell was an operator until 1963.

### Factual and Procedural Background

A. *The Problem*

The plaintiffs in the case are six families who own or live in houses in West Point, a town in Tippecanoe County. There is no municipal drinking water system in West Point and all of the families rely on groundwater. The first indication of a problem with the water supply appeared in February or March of 1989 when plaintiff Kimberly Meyer noticed that the tap water in her home smelled of petroleum. She notified the Tippecanoe County Health Department, which alerted the Indiana Department of Environmental Management ("IDEM"). In June 1989, laboratory tests of water from the Meyer residence detected a number of contaminants, including benzene, a known carcinogen. IDEM installed a carbon filter on the Meyers' well in late July 1989 to make the water safe to use. Over the course of the next year, carbon filters were installed on the wells of each of the six families. Environmental testing eventually concluded that gas-

oline from a retail station on the northwest corner of Washington and Main streets in West Point was the source of the groundwater contamination.

B. *A Brief History of the West Point Station*

Fred Smith purchased the station in West Point in 1946. At that time it was changed from a Standard brand station to Shell and assumed the conventional appearance of a Shell station. At the time Smith bought the station, his principal occupation was as a "commissioned agent" or "commissioned driver" for Shell.[1] In this capacity, Smith delivered gasoline from Shell's bulk plant in Lafayette to farmers and to the West Point station and to one other that he owned. As a "commissioned driver" Smith had a desk at the bulk plant where he picked up orders. He owned the truck, but Shell owned the tank on the back of the truck. Shell owned the gasoline Smith delivered and retained title to it until payment was remitted by the purchaser to Shell.

In 1963, Murphy Enterprises ("Murphy"), owned by Bill Murphy, bought the Lafayette bulk plant from Shell and became a "jobber" for Shell. At this point, Smith became a commissioned driver for Murphy and Murphy took ownership of the tank on the back of Smith's truck. Murphy purchased product from Shell and stored it at the bulk plant. In 1971, Murphy changed suppliers from Shell to Unocal. At that time, Murphy entered into a written contract with Unocal, apparently the first written agreement documenting any of these arrangements. Murphy's affiliation with Unocal ended in 1980 when the bulk plant was sold.

Although Smith owned the West Point station, he never managed it. Over the years he had oral arrangements with a number of "lessees" who typically operated combination

---

1. From 1946 to 1955, Smith was a driver for Shell American Petroleum Company, a petroleum distribution company that, according to the record, served northern Indiana and perhaps other areas. According to the Joint Stipulation of Facts, Shell American Petroleum Company merged into Shell Oil Company in 1955. The record does not disclose the state of domicile of either corporation as of 1955. However, under the laws of this and other states, a surviving corporation acquires "all liabilities of each corporation party to the merger." IND.CODE § 23–1–40–6(a)(3) (1998); *accord* DEL.CODE ANN. tit. 8, § 259 (Michie 1991). The parties have raised no issue related to the status of Shell Oil and Shell American, and Shell Oil has not disputed its assumption of any liability that Shell American may have incurred.

gasoline stations and automotive service shops. These arrangements were informal and few lasted more than a year or two. The lessee/station manager typically paid the bulk plant directly for the gasoline Smith delivered to it. However at least one of Smith's lessees paid him for the gasoline at the time of delivery. In these "leases" Smith's "rent" was based on the volume of gasoline sold by the station ("so many cents per gallon").

Fred Smith distributed gasoline from the bulk plant until his death in 1979. His wife, Margaret Smith, continued to own the West Point gasoline station until 1981 when it was sold to Robert Van Meter. The site was not operated as a gasoline station after 1981 and Van Meter removed the underground storage tanks from the ground in October 1989. At the time the Landowners filed suit in 1993, the property was still owned by Van Meter and housed Van's Wholesale Auto Body Shop.

### C. The Statutory Background

The General Assembly passed the Indiana Underground Storage Tank Act[2] in 1987. The Act generally provides for the regulation of underground storage tanks ("USTs") and the prevention and remediation of pollution from tanks. It contains specific provisions designed to correct contamination from leaking underground storage tanks ("LUSTs"). These "corrective action" provisions are quite similar to provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 to 9675 (1994 & Supp. II 1996), designed to clean up hazardous waste. The Act gives IDEM authority to promulgate rules to enforce its provisions, including the ability to require owners and operators of underground storage tanks to take corrective action. IND.CODE §§ 13–23–1–2 & 13–23–13–1 (1998). Indiana's Act has some provisions not commonly found in the statutes of the 45 states that have underground storage tank legislation. One significant difference is that Indiana's law does not limit the ability to seek corrective action to the state department of environmental management. Rather, the Act includes a provision for recovery of corrective action costs and attorneys fees by a private party who successfully prosecutes a claim against an owner or operator. Id. § 13–23–13–8.

Unlike the corrective action provisions, the regulatory provisions in Indiana's Act are loosely based on the federal Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. §§ 6901 to 6992k (1994 & Supp. II 1996). RCRA was first enacted by Congress in 1978 as an amendment to the Solid Waste Disposal Act. Provisions specifically dealing with petroleum storage were added in 1984. RCRA provides a comprehensive regulatory scheme governing the treatment, storage and disposal of solid and hazardous wastes. Indiana's Act contains a definition of "operator" identical to the one found in RCRA and in the UST laws of some other states. The Act's provision governing liability for costs, however is unlike RCRA's citizen suit provision. RCRA allows suits against a past or present "generator," "owner" or "operator" only where the release presents "an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B) (1994 & Supp. II 1996). Once a site has been cleaned up, private parties may not recover costs from owners or operators under RCRA. See Meghrig v. KFC Western, Inc., 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). In contrast, Indiana's law expressly anticipates payment of costs by owners and operators before or after cleanup. See IND.CODE § 13–23–13–8(b) (1998).

### D. Proceedings in this Lawsuit

Richard and Kim Meyer, Gary and Bridget McDaniel, Jim and Terri McDonald, Dan and Vivian McDaniel, Alvin and Verna Mae Casad and Helena Byers (collectively, the "Landowners") sued Shell and Unocal, (together, the "Oil Companies") asserting both common law claims and claims under the Act for groundwater contamination resulting from petroleum leaking from the USTs located at the West Point gasoline station. They

**2.** Pub.L. No. 172–1987, 1987 Ind. Acts 2160–72; see now IND.CODE §§ 13–23–1 to 13–23–15 (1998) (formerly codified at Id. §§ 13–7–20 to 13–7–42 (1993)).

also sued Van Meter and Margaret Smith, but dismissed them before trial. The parties agreed to an unusual procedure in which they tried the five common law claims to a jury but reserved the remaining claim under the Act to a bench decision. The jury returned a verdict in favor of the Oil Companies on all common law counts and judgment was entered on that verdict in October of 1994.

The parties then filed cross motions for summary judgment on the UST claim, both of which were denied. Although it appears that a second trial phase was anticipated by the court, the parties stipulated that they had no further evidence to present and submitted the claim under the Act for decision on the record developed in the jury phase. In a Memorandum Opinion and Order on May 16, 1995 (the "May Order"), the trial court found the Oil Companies liable as "operators" under the Act. After a bench trial on corrective action costs necessary to remediate the petroleum release the trial court issued a Judgment on September 9, 1995 (the "September Judgment"), incorporating the May Order. The court awarded the Landowners $2,743,660.21 for corrective action costs, $1,459,721.25 for attorney fees and $179,350.70 for litigation expenses.

The Court of Appeals affirmed the trial court's finding of liability and award of costs for the corrective action plan with the exception of medical monitoring costs. The court also reversed and remanded with instructions to allocate attorney's fees and costs between the unsuccessful common law claims and the successful claim under the Act, and to substitute interest on the delayed attorney's fees for the multiplier used by the trial court. We granted transfer.

The Oil Companies present several issues, which we restate as:

I. Does the judgment on the jury verdict bar the claim under the Act under the doctrine of collateral estoppel?

II. Do the Landowners have standing to bring an action under the Act for "a contribution" even though they are not persons liable under the Act?

III. Are the Oil Companies "operators" of the station's tanks as this term is used in the Act?

IV. Was the trial court's allocation of liability between Shell and Unocal proper?

V. Does the Act permit recovery of anticipated costs for future corrective action?

VI. Are medical monitoring costs "corrective action costs" recoverable under the Act?

VII. Was the attorneys' fee award properly calculated?

In addition, the Landowners filed a cross appeal arguing that they are entitled to a new trial on the common law claims because of an erroneous jury instruction on federal trademark protection.

### I. Collateral Estoppel

The Oil Companies assert that an essential element of Count I—the Oil Companies' status as operators—was fully and fairly litigated before the jury and was decided adversely to the Landowners. As a result, the Oil Companies argue, the trial court was precluded from finding them liable under the Act. Specifically, their argument is: (1) the jury found in favor of the Oil Companies on the claim of strict liability for an abnormally dangerous activity; (2) the finding for the Oil Company necessarily turned on the jury's conclusion that the Oil Companies did not control the West Point gasoline station; (3) in order to be an "operator" under the Act, a party must have control over the gasoline station; therefore, (4) under the doctrine of collateral estoppel, the jury's implicit finding on control precludes a finding that either Oil Company is an operator under the Act.

■ Collateral estoppel or issue preclusion bars subsequent litigation of an issue necessarily adjudicated in a former suit if the same issue is presented in the subsequent suit.[3] Even if the Oil Companies were correct that control is necessary to the common

---

**3.** It is not apparent that under the procedure adopted in this case the judgment on the common law claims was in a prior proceeding so as to invoke collateral estoppel considerations. However, the parties make no contentions in this respect. Accordingly, we do not address that point and express no opinion on it.

law counts and that the "control" litigated in the common law counts is identical to the control necessary for liability under the Act,[4] it does not follow that the jury verdict necessarily adjudicated the vicarious liability of the Oil Companies under the Act. The Act uses the term "responsibility for" the daily operations as well as "in control of" those operations. As elaborated below, more than one person can be an operator of a given tank, and the absence of the ability to control the daily operation does not preclude liability as one "having responsibility for" its operations. Accordingly, even if entitled to collateral estoppel effect, the jury verdict did not resolve the status of the Oil Companies under the Act.

 Moreover, a prime consideration in defensive use of collateral estoppel is whether the party against whom the prior judgment is asserted has a "full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." *Sullivan v. American Cas. Co.*, 605 N.E.2d 134, 138 (Ind.1992). A trial court's decision to refuse to apply collateral estoppel will be reversed only upon a showing of abuse of discretion. *Wilcox v. State*, 664 N.E.2d 379, 381 (Ind.Ct.App.1996). The trial court concluded in its May Order that Plaintiffs did not have a full and fair opportunity to litigate defendants' liability under the Act, and that it would be unfair to apply collateral estoppel for several reasons: (1) the Oil Companies agreed that Count I—liability under the Act—would be tried separately to the court, (2) the defendants objected to and the court excluded testimony from plaintiffs' expert on the breadth of Indiana's environmental laws,

(3) the jury was completely uninformed about Indiana's environmental policies or the scope of "operator" liability. The trial court also found the Oil Companies' argument on collateral estoppel "questionable" in light of the Oil Companies' arguments to the federal court in their unsuccessful attempt to remove the case. The district court noted that the Oil Companies had argued to the federal court "that Count I is 'separate' and 'distinct' from plaintiffs' common law theories and that resolution of the common law claims would *not* preclude the litigation of Count I" (emphasis in original). Accordingly, we find no abuse of discretion in the trial court's disallowance of the use of collateral estoppel.

## II. The Landowners' Standing Under the Act

The Act provides for actions by private parties to recover costs of a "corrective action:"

A person who:

. . .

(2) undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an order issued under this chapter, IC 13–23–14–1, IC 13–7–20–19 (before its repeal), or IC 13–7–20–26 (before its repeal);

is entitled to receive a contribution from a person who owned or operated the underground storage tank at the time the release occurred. . . . In resolving a contribution claim, a court may allocate the cost of a corrective action among the parties to

---

4. It is undisputed that the jury was not instructed on liability under the Act. Nevertheless, the Oil Companies argue that the issue of control under the Act was "inherently litigated" when the jury considered the control necessary for liability under the theory of respondeat superior on Count VI. A comparison of the plain language found in the jury instructions and the Act demonstrate that the issues of strict liability in tort and liability under the Act are neither identical nor coextensive. The jury was instructed to find liability under the doctrine of respondeat superior if the Oil Companies:

> specifically and directly control, or have the right to control means by which Fred Smith

and the station operators conducted their activities ... 'control' depends on the existence of an implied or express contract or agreement [which] would have allowed the Defendant to approve of and direct the specific means and manner of performance of activities.

At first glance, the two standards of control are not identical. "Control" in the jury instruction was modified by "specifically and directly." "Control" in the Act is not so modified. This difference is significant enough to allow the trial court to conclude the jury had not "inherently" considered the Act's lesser version of control when deciding the strict liability claim.

the action using equitable factors that the court determines are appropriate.

IND.CODE § 13–23–13–8(b) (1998). The Oil Companies argue that the Landowners do not have standing under this section. They point out that the private remedy permits recovery of "a contribution." From this they argue that because the Landowners had no legal liability to third parties to take corrective action regarding the leak, they are not entitled to "contribution" under the Act.

■ Prior to 1991 only the state could initiate corrective actions, but owners and operators who paid costs of state-initiated corrective actions were granted subrogation rights to recover against a third party if the release was caused solely by the acts or omissions of the third party. IND.CODE § 13–7–20–21 (1988). This section was amended in 1991 to permit recovery by any "person" taking voluntary corrective action as well as those recovering expenses incurred as a result of an enforcement order.[5] The Landowners are plainly "persons."[6] We agree with Judge Tinder that "[t]he amendment allows a current owner (or any other person) to undertake corrective action voluntarily and then seek contribution." *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 777 F.Supp. 713, 720 (S.D.Ind.1991). The 1991 amendment repealed the requirement of a state-initiated corrective action, and allowed for voluntary cleanups. In addition, it explicitly provided for owner and operator liability for costs of corrective actions initiated by the state or another person, not merely cost recovery of state initiated actions. The important change permitting recovery not only by "owners and operators" but by any "person" significantly expanded the group of individuals who are entitled to invoke a right to "a contribution" under the Act.

■ The Oil Companies point out that "contribution" means recovery to share a legal liability with a third party. Therefore, they contend, it necessarily refers to a claim by another owner or operator because only owners and operators are liable parties under the Act. The term "a contribution" is unknown in the law, at least to this writer. The Oil Companies are correct that "contribution" means, to a lawyer at least, a sharing of a liability.[7] However, in the context of this statute, we are unpersuaded that the Legislature intended to permit only owners and operators to recover costs of corrective action. In reading a statute, we will not overemphasize a strict literal or selective meaning of individual words. *Clifft v. Indiana Dep't of State Revenue*, 660 N.E.2d 310, 316 (Ind.1995); *Spaulding v. Int'l Bakers Serv.*, 550 N.E.2d 307, 309 (Ind.1990). The legislative intent as ascertained from the Act as a whole prevails over the strict literal meaning of any word or term. *Park 100 Dev. Co. v. Indiana Dep't of State Revenue*, 429 N.E.2d 220, 222 (Ind.1981). We agree with the Oil Companies that the current statute is somewhat internally inconsistent in retaining "contribution" to describe the remedy available after the group entitled to seek a remedy was expanded to include those who are not liable under the Act. However, the Legislature's very obvious affirmative change of language to permit recovery by "a person," demonstrates a clear purpose of the General Assembly to make this remedy available to anyone who initiates a corrective action.

5. Pub.L. No. 129–1991, § 8, 1991 Ind. Acts 2126–27. The 1991 amended version was recodified along with all of Indiana's environmental laws to new sections of Title 13 in 1996. Pub.L. No. 1–1996, § 13, 1996 Ind. Acts 370–402. The new section included minor language changes, substituting "entitled to" for "shall" as found in the 1991 version. *See now* IND.CODE § 13–23–13–8(b) (1998).

6. Indiana Code § 13–11–2–158(d) states "'Person' for purposes of IC 13–23, has the meaning set forth in subsection (a)." Subsection (a) defines "person" as "an individual, a partnership, a copartnership, a firm, a company, a corporation, an association, a joint stock company, a trust, an estate, a municipal school corporation, a city, a school city, a town, a school town, a school district, a school corporation, a county, any consolidated unit of government, political subdivision, state agency, a contractor, or any other legal entity."

7. BLACK'S LAW DICTIONARY 328 (6th ed. 1990) defines contribution as a "right of one who has discharged a common liability to recover [from] another also liable. . . ."

Finally, it is instructive to note that other state and federal environmental laws explicitly make the distinction the Oil Companies suggest is implied here. Indiana's environmental laws include definitions of "parties," "party," "responsible party" and "responsible person,"[8] any one of which, if substituted for "person" would have limited those who can recover in corrective action suits under the Act. Additionally, CERCLA was already on the books at the time Indiana adopted the change to the Act. CERCLA allows suits only by another responsible party. 42 U.S.C. § 9613(f)(1) (1994 & Supp. II 1996). If the legislature intended to restrict recovery actions to any of these more limited groups, both Indiana environmental laws and CERCLA provided linguistic models to accomplish this. Those laws were clearly before the legislature at the time Indiana's UST statute was drafted, and later amended. We conclude that the Landowners, even though they have no liability as owners or operators, are "persons" entitled to invoke the right to recover under the Act.

### III. Liability as an Operator under the Act

CERCLA imposes liability for hazardous waste cleanups on any contributor to a Superfund site. 42 U.S.C. § 9607(a) (1994 & Supp. II 1996). However, CERCLA contains a "petroleum exclusion" that removes petroleum leaks from the coverage of that law. The Indiana Act does apply to petroleum products, but, unlike CERCLA, does not impose liability on anyone supplying pollutants to a leaking tank. Rather, at the time the suit was filed the Act imposed liability only on "owners" and "operators" of the tank. It is clear that neither Oil Company

was ever an owner of the tanks in West Point. However the trial court found both to be "operators." "Operator" is defined as a person "in control of" or having "responsibility for the daily operation" of the tank.[9] The trial court concluded that the Oil Companies did not exert actual control over the daily operation of the underground storage tanks at the West Point station. Both the trial court and the Court of Appeals based liability under the statute on the "responsibility for" prong of the definition. The trial court concluded that "[t]he phrase 'having responsibility for' means those parties that retained *authority* to control the UST's and that *should* be responsible as a matter of public policy" (emphasis in original).

In response, each Oil Company asserts that, as a matter of law, its role as a wholesale supplier of petroleum to the station did not amount to having "control" or "responsibility for" the "daily operation" of the underground storage tanks at the station. The Landowners respond that the Oil Companies retained the ability to control the station through the jobber agreements with the bulk plant owner, Murphy, and thus, as the trial court concluded, met the "responsibility for" prong of the definition. Further, the Landowners suggest that the Oil Companies are exactly the parties the legislature intended to have bear the costs of corrective actions because the Oil Companies are in the best position to clean up contamination by reason of their greater access to technology and vastly greater financial resources. The Landowners also contend that because the Oil Companies designed and profited from a distribution system with locally placed storage tanks, they should be held liable for the

---

8. *See* IND.CODE § 13–11–2–152 (1998) (parties); *Id.* § 13–11–2–153 (party); *Id.* § 13–11–2–191 (responsible party); and *Id.* § 13–11–2–192 (responsible person).

9. The full text of the definition is:

(d) "Operator", for purposes of IC 13–23, except as provided in subsection (e), means a person:
 (1) in control of; or
 (2) having responsibility for the daily operation of an underground tank.
(e) "Operator", for purposes of IC 13–23–13, does not include a person who:

(1) does not participate in the management of an underground storage tank;
(2) is otherwise not engaged in the:
 (A) production;
 (B) refining; and
 (C) marketing;
of regulated substances; and
(3) holds evidence of ownership, primarily to protect the owner's security interest in the tank.
IND.CODE § 13–11–2–148 (1998). Sub-section (d) has been unchanged since the Act's passage in 1987. Sub-section (e) was added to the Indiana Code in 1998. *See* Pub.L. No. 90–1998, § 7, 1998 Ind. Acts 1208.

costs of necessary corrective action. We granted transfer to address the scope of the definition of operator under the Act and to resolve the conflict in the Court of Appeals between this case and *Shell Oil Co. v. Lovold,* 687 N.E.2d 383 (Ind.Ct.App.1997), *reh'g granted,* 691 N.E.2d 521 (Ind.Ct.App.1998), *trans. granted,* 698 N.E.2d 1194 (Ind.1998).

## A. Standard of Review

■ The trial court's May Order included findings of fact, conclusions of law and an entry of summary judgment on the issue of liability for the Landowners. The court's September Judgment incorporated the May Order. We review the findings incorporated in the final judgment pursuant to Trial Rule 52. The findings or judgment are not to be set aside unless clearly erroneous, and due regard is to be given to the trial court's ability to assess the credibility of the witnesses. Ind. Trial Rule 52(A). This Court first considers whether the evidence supports the factual findings and then whether the findings support the judgment. *McGinley–Ellis v. Ellis,* 638 N.E.2d 1249, 1252 (Ind. 1994). The findings are clearly erroneous only when a review of the record leaves a court firmly convinced a mistake has been made. *State v. Van Cleave,* 674 N.E.2d 1293, 1295 (Ind.1996), *reh'g granted in part,* 681 N.E.2d 181 (Ind.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1060, 140 L.Ed.2d 121 (1998). We disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. *Chidester v. City of Hobart,* 631 N.E.2d 908, 910 (Ind.1994). We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id.* A judgment is clearly erroneous under Trial Rule 52 if it relies on an incorrect legal standard. *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind.1997).

## B. The Language of the Act

■ The first and often the only step in resolving an issue of statutory interpretation is the language of the statute. "Responsible" is defined as: "liable; legally accountable or answerable." BLACK'S LAW DICTIONARY 1312 (6th ed. 1990). "Responsibility" is defined as: "the state of being answerable for an obligation." *Id.* These dictionary definitions do little to resolve this case and produce only circular reasoning— one is liable under the Act where one is "responsible" and vice versa.

Some clues do lie in the text of the Act, however. The definition of "operator" includes the phrase "daily operation of the underground storage tank."[10] Although the Act does not require interaction with the tank literally each day, "daily" implies at least some continuous level of activity as opposed to installation, repair or removal of a storage tank, or performance of some other irregular or infrequent action with respect to it. From the beginning of the time span relevant to this case the "daily operations"[11] i.e., the activities routinely associated with the use of the tank, included filling it, dis-

---

10. Some states have adopted more detailed definitions of "the daily operations" of the UST, others explicitly exclude particular tasks or persons. *Compare* N.H.REV.STAT. ANN. ch. 146–C:1, XIII (1996) ("responsibility for the care, custody and control of the daily operation ...."); UTAH CODE ANN. § 19–6–402(17) (1998) ("any person in control of or who is responsible on a daily basis for the *maintenance* of an underground storage tank ..." (emphasis added)) *with* N.C. GEN.STAT. § 143–215.77(5) (1997) (excluding from the definition of "having control over oil or other hazardous substances" (including petroleum) those who supply or deliver to a UST that is not owned or otherwise operated by that person unless he or she has reason to know of leak); KAN. STAT. ANN. § 65–34,102(i) (1992) (excluding from the definition of operator those who fill the tank without pumping gasoline from the tank).

11. The phrase "daily operation" is used in three other statutes: the Deputy Commissioner shall supervise the daily operation of the Agriculture and Rural Development Commission, IND.CODE § 4–4–22–20 (1998); schools may not use capital funds proceeds for the daily operation of the school, *Id.* § 21–2–11–4; and Regulated Amusement Devices permittee must maintain daily operation and inspection logs or checklists, *Id.* § 22–15–7–5. None of the statutes define daily operation, however each includes distinct activities depending on what is being operated. In the case of underground storage tanks, at least before 1984, there are a limited number of activities associated with the tank including filling, testing and dispensing from the tank.

pensing gasoline from it and measuring its contents. We are directed to no other routine, regularly conducted activity except those required by state and federal law in later years.[12] Until more sophisticated techniques were developed, measurement was accomplished by periodic "sticking" i.e. placing a dipstick like pole in the tank to determine the level of fluid. Second, the statute requires that the "control" or "responsibility" relate to the "operation" of the underground storage tank itself and not to other aspects of the station's operation or management. As the structure of the statute makes clear "operator" is defined in light of what is being operated—in this case the UST. See Nurad, Inc. v.William E. Hooper & Sons Co., 966 F.2d 837, 842 (4th Cir.1992) (operator liability attaches under CERCLA only if the defendant had authority to control the cause of the contamination).

### C. Practical Leverage Over the Station's Management is Insufficient

The Landowners and some amici argue that a person "having responsibility for" includes persons and entities who retain the "ability to control the operations of the station," in other words, practical control. The Oil Companies contend that "responsibility for" means "right to control," not practical ability to cajole, influence or demand results from the stations' managers. Because neither party can point to language that readily resolves this dispute, each urges us to resort to precedents under other assertedly analogous statutes. The Landowners urge a broad reading of the definition in light of the legislature's directive to construe environmental statutes liberally to effectuate their purpose. See IND.CODE § 13–12–2–1 (1998). Noting that Indiana's Act is remedial, as is CERCLA, the Landowners offer decisions under that federal statute to support their claim that "operator" includes those who have the practical ability to control the affairs of the station. Several CERCLA cases state that those who have the "ability to control" are operators under that law, but find no "operators" under the facts presented. See, e.g., Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 158 (7th Cir.1988) (supplier of chemicals not an "operator" where it could only stop selling product and deny use of trademark); Nurad, 966 F.2d at 842 (tenants were not "operators" because lease provisions did not include "authority to control the hazardous waste"); but see CPC Int'l, Inc. v. Aerojet–General Corp., 731 F.Supp. 783, 788 (W.D.Mich.1989) (party is operator where it assumes control of an activity—the removal and disposal of waste). The Oil companies respond that RCRA, not CERCLA, contains a definition of "operator" that is the same as that found in Indiana's Act.[13] Accordingly they contend only RCRA case law is relevant here. This point is moot however because the RCRA cases cited by the parties turn on other provisions of RCRA not at issue here and do not address the definition of operator.

12. Beginning in 1992, Indiana's rules require owners and operators to report all suspected releases, maintain documentation of corrosion protection equipment, system repairs, compliance with release detection and keep records required available for inspection at the UST site or readily available site. 329 IND. ADMIN. CODE 9–3–1 (1996). Indiana's rules also require compliance with federal rules for release detection under 40 C.F.R. § 280.41, and testing and monitoring under 42 U.S.C. § 6991d. 329 IND. ADMIN. CODE 9–2–2 (1996). Tanks must be monitored at least every 30 days with one of the agency approved methods under 40 C.F.R. § 280.41 (1997). Federal rules also require record keeping of all testing, monitoring, calibration, maintenance and repair. 40 C.F.R. § 280.45 (1997). Owners and operators also must furnish information about testing and monitoring to a representative of the EPA and permit representatives to enter, inspect, take samples and or corrective action. 42 U.S.C. § 6991d(a) (1994 & Supp. II 1996). Finally, owners and operators must establish evidence of financial responsibility with minimum coverage of at least $1,000,000 for each occurrence. IND.CODE §§ 13–23–4–1 to 7 (1998). No one contends that the Oil Companies would be required to comply with these regulations if the USTs were still in operation.

13. The definition of "operator" in the Act is identical to the definition of the same term in RCRA, 42 U.S.C. § 6991(4) (1994 & Supp. II 1996) and EPA regulations promulgated pursuant to RCRA. 40 C.F.R. § 280.12 (1997). The CERCLA definition is unusually unhelpful, tautologically defining an "operator" as any person "operating," or who "operated," a facility. See 42 U.S.C. § 9601(20)(A) (1994 & Supp. II 1996).

■ For several reasons, we conclude that the practical ability to influence the station is in itself insufficient to render a refiner an "operator" of the tanks.

### 1. *Federal Legislative History and Administrative Definitions*

Indiana publishes only sparse legislative history. However, Indiana's Act is based largely on the federal UST Act found in RCRA, and Indiana's definition of "operator" is drawn verbatim from RCRA. Accordingly the federal legislative history is relevant to the extent it bears on the meaning of "operator." As a preliminary matter, it is important to note that CERCLA was designed to deal with the cleanup of hazardous waste sites. If applicable here, it would render the Oil Companies liable as responsible persons by reason of their having contributed gasoline to the site. 42 U.S.C. § 9607(a) (1994 & Supp. II 1996). However, as noted above, CERCLA contains an explicit exception for petroleum. According to a Congressional Research Service Report "at the time of [CERCLA's] passage, several members wanted to include petroleum product spills in the Superfund Act, but the possibility that a prolonged debate would prevent enactment before the end of the Congress led these members to agree to the exclusion...." Donald V. Feliciano, "Leaking Underground Storage Tanks: a Potential Environmental Problem," Congressional Record, February 29, 1984, pp. S2026–S2030, *reprinted in* A LEGISLATIVE HISTORY OF THE SOLID WASTE DISPOSAL ACT AS AMENDED, at 2145 (1991) [hereinafter LEGISLATIVE HISTORY].

As an alternative to removing the petroleum exemption from CERCLA, the UST Act was introduced by Senator Durenberger in 1984 as Amendment 2758 to Senate Bill 757, the reauthorization of RCRA.[14] The amendment initially defined "owner or operator" as "any person who owned, operated, or otherwise controlled activities at such tank immediately prior to such abandonment."

Amendment by Senator Durenberger, Congressional Record, February 29, 1984, pp. S2026–S2030, *reprinted in* LEGISLATIVE HISTORY at 2139. A second version of the amendment was adopted by the Senate a few months later that defined "operator" as "any person in control of or having responsibility for the daily operation of the underground storage tank." Amendment by Senator Durenberger, Congressional Record, July 25, 1984, pp. S9138–9217, *reprinted in* LEGISLATIVE HISTORY at 2294. The second amendment contained no time limitation. It removed "otherwise controlled" from the definition of "owner or operator," separated the definitions of "owner" and "operator," and expanded the definition of "operator" to include two separate categories of "operators," those who "control" and those who have "responsibility" for the daily operation of the tank. This version of the amendment was adopted by the conference committee. Conference Report to Accompany H.R. 2867, at 123, 126–27 *reprinted in* LEGISLATIVE HISTORY at 2436–7. The statute contemplates the possibility that there could be more than one operator of a tank at the same time: those who "control" the on-site personnel who have daily or regular contact with the tank, and those who have "responsibility" for those activities. This reading of the statute is consistent with EPA's interpretation of the statute. "The term 'operator' is very broad.... As with owners, there may be more than one operator of a tank at a given time. Each owner and operator has obligations under the statute and the regulations." 60 Fed.Reg. 46,693 (1995).

The Oil Companies point to several EPA regulations and public pronouncements that they contend suggest that refiners who merely supplied gasoline are not "operators." For example, in considering the effect of regulation and the necessity to keep standards simple and implementable, the EPA observed that "many UST facilities are owned and operated as small local busi-

---

14. The Landowners assert the testimony of individuals at the Senate subcommittee hearings on the bill as evidence of lawmakers' intent to include the Oil Companies as operators under the Act. The comments of individual speakers or members of Congress are not necessarily reflec-

tive of the views of the entire Congress unless expressed in the language of the legislation. The Conference Committee report, which is more persuasive as evidence of legislative intent, offers no insight on the scope of the definition of operator.

nesses, such as 'Mom and Pop' gasoline service stations and convenience stores. These small entrepreneurs, who are used to operating their business with minimal regulation, will be significantly affected by environmental regulations." 53 Fed. Reg. 37,096 (1988). Similarly, it observed that "the UST regulated community, [is] largely composed of small businesses with limited resources...." *Id.* at 37084. However, these comments merely reflect the obvious fact that by far the largest in number of "operators" were expected to be small businesses. It does not necessarily lead to the conclusion that the EPA, as the federal agency charged with enforcing the statute, excluded the possibility that major oil refiners could also be "operators" of independent stations under the federal UST Act. And of course, to the extent a refiner directly owns and operates retail outlets, it is the operator of the station's tanks. The existence of company owned retail outlets has been recognized throughout the evolution of legislation on USTs and was surely known to the EPA. Accordingly, these quotes cannot be read to exclude the possibility of a large, financially solvent operator.

## 2. *Lender Liability Provisions*

The Landowners point to a recent amendment, quoted in footnote 9 *supra*, apparently intended to exempt lenders from the scope of "owner" and "operator." They contend that these amendments are evidence of refiners' liability under the Act. Specifically, they contend that: (1) lenders must have been exposed to liability under the act as operators or the legislature would not have amended the Act to exclude them; (2) lenders generally have even more attenuated relationships to USTs than refiners; therefore, (3) if lenders were potentially liable under the Act before the amendment, refiners must be liable because the amendment does not help them.

Indiana's 1998 amendment added section (e) to the definition of "operator" to exclude lenders who do not otherwise participate in the "management" of the tank.[15] In broad brush, this amendment provided that one who lends to a station and takes title solely as a security interest without "participating in the management" of the tank, is not an operator. This statutory modification followed similar changes in federal statutes and regulations.[16] It is obvious why lenders who hold title to the tank, even if only as security for a loan, were concerned that they might be deemed "owners." In addition, the EPA explained that a foreclosing lender might become an "operator," and concern for retailers' access to financing led to an explicit federal exemption for lenders that removed them from both owner and operator status. 60 Fed.Reg. 46,695 (1995).

The 1998 amendment to Indiana's UST Act tracked the federal lender provision in Indiana's definitions of "operator" and "owner." The Landowners suggest that this change must necessarily mean that those who have practical leverage over the station managers are "operators." However, its inclusion in Indiana's definition of both "owner" and "operator" seems more attributable to the lobbying power of the lending community and its care to win protection for its members than an expression of opinion by a subsequent legislature as to the meaning of the Act. Nor can we draw any inference from the failure of the General Assembly to amend the Act in response to the decision of the Court of Appeals in this case. The decision was rendered in August 1997 and the arguably conflicting decision in *Lovold Co. v. Shell Oil Co.*, was rendered in November 1997. We granted transfer in this case on

---

15. "Operator" for purposes of IC 13–23–13, does not include a person who: (1) does not participate in the management of an underground storage tank; (2) is otherwise not engaged in the: (A) production; (B) refining; and (C) marketing; of a regulated substance; and (3) holds evidence of ownership, primarily to protect the owner's security interest in the tank.
Ind.Code § 13–11–2–148(e) (1998).

16. The federal UST Act was amended in 1996 to exclude from the definitions of "owner" and "operator" one who "without participating in the management of an underground storage tank and otherwise not engaged in petroleum production, refining, marketing, holds indicia of ownership primarily to protect the owner's security interest in the tank." Pub.L. No. 104–208, § 2503, 110 Stat 3009–468, (codified as amended at 42 U.S.C. § 6991b(h)(9) (1994 & Supp. II 1996)); *see also* 40 C.F.R. § 280.200 (1997).

January 21, 1998, in the midst of a "short session" in which the ability to consider any legislation is limited. Without more, the failure of the General Assembly to act cannot be regarded as a statement of policy.

### 3. Leaded Fuel Regulation

The Landowners contend that the Oil Companies' ability to force branded stations to comply with leaded fuel regulations in the 1980s proves that the Companies retain the "ability to control" the stations, and this in turn renders them responsible for the storage tank. It appears to us, however, that this statutory history suggests the opposite. When leaded fuel was identified as an object of national concern, Congress elected to make refiners liable for failure of compliance by their branded stations whether or not the station was independent.[17] This makes it clear that the legislature can, if it wishes, impose liability on the refiners as a means of causing them to use their practical ability to enforce the regulation against retail stations. That was the path Congress chose when leaded gasoline was banned from the distribution system. However, we find no indication in Indiana's statute or the regulations promulgated under it that the legislature chose to impose liability for practical ability to control in the area of LUST cleanup. Its presence in one statute and absence in UST legislation shows, if anything, the legislature's choice to refuse to impose this derivative liability on refiners in the case of USTs.

### 4. IDEM's Interpretation of the Act

IDEM as amicus curiae asserts that the Court of Appeals and the trial court properly construed "operator" and that the department construes "operator" in the same manner. IDEM argues that the Court owes

---

17. 42 U.S.C. § 7545(n) (1994). EPA rules impose a fine of up to $25,000 per day on refiners for the dispensing of any leaded gasoline at any branded station, whether owned or operated by the refiner or not. 40 C.F.R. §§ 80.5 & 80.22 (1997).

18. "Law is the province of the judiciary, and courts rather than administrative agencies are charged with the responsibility to resolve questions of statutory construction." *Indiana Dep't*

---

deference to the agency's interpretation of the statute it enforces.

IDEM has been involved in the West Point site since 1989, installing carbon filters in the Landowners' homes, testing the Landowners' water and engaging an environmental consulting firm, Roy F. Weston, Inc., to investigate the extent of the contamination and the source. IDEM is a "person" under the Act and has the ability to recover its corrective action costs. IND.CODE §§ 13-11-2-158(a) & 13-23-13-8 (1998). However, at no time did IDEM pursue the Oil Companies. Indeed, IDEM offers no example of agency enforcement action in any other case against a refiner who supplied gasoline to a branded station. In sum, although IDEM now takes the position in this Court that it interprets "operator" to include major oil producers, it has taken no action to that effect at the operating level.

■ Ultimately, the definition of "operator" under the statute presents a question of law.[18] However, administrative interpretation may provide a guide to legislative intent. "A long adhered to administrative interpretation dating from the legislative enactment, with no subsequent change having been made in the statute involved, raises a presumption of legislative acquiescence which is strongly persuasive upon the courts." *Board of Sch. Trustees v. Marion Teachers Ass'n*, 530 N.E.2d 309, 311 (Ind.Ct. App.1988); *accord Baker v. Compton*, 247 Ind. 39, 42, 211 N.E.2d 162, 164 (1965). In this case IDEM's enforcement history is more persuasive than its current position as amicus curiae. IDEM has cited no example of its effort to secure compliance with the Act by a major oil producer on either the regulatory or remedial front. The legislature has never amended the Act to include major oil producers as operators. Much as

*of Natural Resources v. Town of Syracuse*, 686 N.E.2d 410, 411 (Ind.Ct.App.1997) (citing *Mance v. Board of Dirs. of Pub. Employees' Retirement Fund*, 652 N.E.2d 532, 534 (Ind.Ct.App.1995)). *See also Twin States Publishing Co. v. Indiana Unemployment Ins. Bd.*, 678 N.E.2d 110, 112 (Ind.Ct.App.1997) *trans. denied* 690 N.E.2d 1181 (Ind.1997) (agency interpretation of the statute is not entitled to deference).

we might agree with the policy considerations underlying IDEM's current position as presented to this Court, we cannot conclude that it represents a longstanding administrative interpretation reflecting legislative acquiescence.

### 5. *Public Policy and Legislative Options*

The Landowners and amici offer compelling public policy arguments in favor of imposing liability on those who both profited from the sale of the contaminant and were in the best practical position to assure its containment. However, as we read the statute these arguments were not accepted by the legislature. In its current procedural posture the sole remedy before this Court turns on statutory interpretation. Accordingly, we are not free to adopt on our own a policy the legislature has rejected. For the reasons given we disagree with the trial court's conclusion that the Oil Companies' retention of "ability to control" through their franchise distribution system was intended by the legislature to create liability as an operator under the Act.

We are dealing with a statute that imposes retroactive liability for damage to the environment that arose from actions that were widespread and accepted at the time they occurred, now decades in the past. Faced with this situation, the legislature had several options in dealing with the costs of compliance with current standards. The General Assembly could have imposed these costs on suppliers to the stations, as CERCLA does with hazardous waste, and as was done in implementing the lead free gasoline requirements. It could have chosen to let the losses fall where they land, leaving every citizen to whatever common law remedies, if any, are available. Or it could have regarded these costs as items to be properly absorbed either by society as a whole or by some broad segment of the economy. This could be achieved by using public funds raised by taxation or by some more targeted device such as a user fee, as in part was done in UST legislation. *See* IND.CODE §§ 13–23–7–2 & 13–23–12–1 (1998). These policy choices were, and are, all available to the General Assembly. However, as we read the current Indiana UST Act, the legislature has not seen fit to constitute every refiner with a brand an operator of the independent station flying its flag. Neither the language of the statute nor its limited legislative history suggests that the Oil Companies who supplied the gasoline to the distribution system, without more, are operators under the Act. And practical leverage over the station owner does not suffice whether through threat by a refiner of debranding, a threat by a bank to call a loan, or any other action by a person that may be able to influence or even dictate how the station's operations are conducted, but has no actual or contractual relationship to the daily operation of the tank.

### D. *The Legal Standard for Operator*

■ Ultimately, the determination of who had "responsibility for the daily operation" and therefore was an "operator" of the tanks at West Point turns on (1) what constituted the daily operation of the tanks, (2) who did these things, (3) in what capacity that person was acting and (4) who is responsible for that person's actions in that capacity. The "daily operation" is to be judged by the standard of the time. Obviously there were fewer activities that constituted the "daily operation" before federal and state regulation of USTs. Determining who is responsible for a given individual's actions is a legal question governed by conventional principles of law. To state the obvious, business associations can act only through people. Yet the Act includes no explicit rule of vicarious liability. Rather, it plainly contemplates that not only those people who literally "operate" the tank are liable, but also those entities who are liable for those individuals under conventional principles.[19] The common law affords a

---

19. Derivative liability under CERCLA has looked to the common law for guidance. "[C]ommon law principles of liability provide a legitimate source of insight in resolving [liability under CERCLA]." *United States v. Aceto Agricultural Chemicals Corp.*, 699 F.Supp. 1384, 1390 (S.D.Iowa 1988) (where statutory language and legislative history are inconclusive and the legislative history shows that the common law was intended to fill such gaps, the common law is a proper source of guidance); *aff'd, United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d

rich trove of tools to resolve issues of derivative or vicarious liability under the statute. Some are undisputed. Neither Oil Company asserts that it could avoid liability if the "operator" in this case was one of its employees, despite the absence of any statutory provision to that effect. Rather, liability in the employer/employee context is drawn from common law principles of master/servant liability. There are, however, doctrines of liability in the independent contractor context that are relevant as well.

■■■■ As a general matter, under the common law a principal is not liable for damages resulting from an independent contractor's wrongful acts or omissions. *Allison v. Huber, Hunt & Nichols, Inc.*, 173 Ind.App. 41, 43, 362 N.E.2d 193, 195 (1977). Under accepted tort doctrines however, an independent contractor may create liability for a principal under some circumstances. First, a principal is subject to liability for physical harm caused to others by the contractor's failure to take reasonable precautions against a special danger inherent in the work. RESTATEMENT SECOND (TORTS) § 427. Here Smith's actions with respect to the tanks—filling it and sticking it—are plainly inherent in the delivery service he undertook to perform for the seller of gasoline to the station. His liability is not for negligence or failure to take precautions, however. Rather, it is imposed by reason of his status as an operator under the statute irrespective of any negligence in his activities with respect to the tanks. A second analogous doctrine is that one who employs an independent contractor to perform work that is abnormally dangerous or is likely to include trespass or nuisance is subject to liability to the same extent as the contractor for physical harm to others. *Id.* §§ 427A & 427B.

■■■■ Indiana case law has specifically recognized and applied these principles. An independent contractor may create liability for a principal if: (1) the contract requires performance of intrinsically dangerous work; (2) a party is by law or contract charged with a specific duty; (3) the act will create a nuisance; (4) the act will probably cause

injury to others unless due caution is taken to avoid the harm; or (5) the act to be performed is illegal. *Bagley v. Insight Communications Co., L.P.*, 658 N.E.2d 584, 586 (Ind.1995); *Denneau v. Indiana & Michigan Elec. Co.*, 150 Ind.App. 615, 620, 277 N.E.2d 8, 12 (1971). Work is intrinsically dangerous if the risk of injury involved cannot be eliminated or significantly reduced by taking proper precautions. *Hale v. Peabody Coal Co.*, 168 Ind.App. 336, 343 N.E.2d 316, 322 (1976). Filling a tank that is known to have the potential to leak and, if it does, to contaminate others' water supplies has elements that are strongly reminiscent of these doctrines. Indeed, the trial court found that underground storage tanks leak despite any known precautions. Contaminant finding its way onto the property of the Landowners has elements of both a trespass and a nuisance and, in addition, is abnormally dangerous. Accordingly, we conclude that in the context of operating a UST, a principal is liable under the Act for an independent contractor's actions to the same extent that common law liability exists for the contractor's actions.

■■■ In the 1960s Shell and many other major oil companies apparently sought to limit their exposure to liability by introduction of the jobber into the distribution chain. For the reasons given in Part III. C., we conclude that this effort was largely successful. Where the chain of responsibility between a refiner and the individual charged with the daily operations of the tank is interrupted by the existence of a jobber, at least on the facts in this record, there is no "control" or "responsibility" on the part of the Oil Company within the meaning of the Act simply by virtue of the refiner's ability to exert practical leverage over the jobber and independently owned station by refusing to sell to it. However, where there is no jobber in the chain of responsibility or some other set of facts creates derivative liability for an operator's actions, the refiner may be liable under the Act. In sum, we conclude that liability of an operator extends to both the individuals who perform the tasks constituting "daily

1373, 1382–83 (8th Cir.1989) (Common law provides guidance in interpreting CERCLA and supports the imposition of liability. CERCLA, like RCRA, is a broad remedial statute.).

operations" of the tank, and those entities who are responsible under conventional doctrines for the actions of those persons.

## IV. Resolution of this Case

### A. Who was an "Operator" and at What Time

The proper definition of "operator" under the Act is a question of law. For the reasons set forth in Part III. D., we conclude that the trial court applied an incorrect test for operator to the facts of the case. Under Trial Rule 52, "[a] judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.1997). The facts as found by the trial court support the conclusion that the Oil Companies retained the practical ability to control how the station was operated. However, the issue in this case is whether the Oil Companies had the requisite contact with the "daily operation of the underground storage tank" at West Point to support liability under the Act.

As discussed in Part III. D., the determination of who has "responsibility for the daily operation" and therefore is an "operator" of the tanks at West Point turns on (1) what constituted the daily operation of the tanks, (2) who did these things, (3) in what capacity that person was acting and (4) who is responsible for that person's actions in that capacity. The resolution of what the daily operations of the tanks are and who did them are related and highly fact sensitive inquiries. During all but two years of this period Fred Smith was the person who filled the tanks and one of the people who checked the tanks. Part of Smith's responsibilities as a commissioned driver included determining the level of inventory in the tanks by "sticking" the tanks. Mrs. Smith, Fred's widow, and Joseph Smith, his son, both testified that Fred stuck the tanks each time he filled them. Keeping track of inventory in this way allowed Smith to know how much gasoline to dispense into the tanks, and to monitor the calculation of how much the station owed the

jobber or Shell and the amount of Smith's commission. It also permitted Smith to identify, in the industry's norm of the time, a major leak that may either raise or lower the level of fluid in the tanks by water seeping in or gasoline leaking out. It is clear from the record that Smith maintained a high frequency of contact with the station and the underground storage tanks. According to Kenny Jackson who rented the West Point station from Smith from 1967 to 1968, Smith maintained the tanks and pumps, although it is unclear in what capacity (owner or commissioned driver) he was acting.[20]

■■■■ Shell concedes that the activities included in Smith's actions as a commissioned driver for Shell—filling the underground storage tanks and measuring the contents—are some of the duties that qualify as "daily operation" of the tanks. To be sure, there is no evidence that Smith stuck the tanks for purposes of preventing environmental contamination. However, the Act does not require us to find that an operator have control or responsibility for the UST for a particular purpose. During the 1940s and 50s there were few tasks to be performed in connection with the operation of the USTs. They included filling, checking inventory and dispensing. Although some of these were undoubtedly performed by the lessees, others were equally clearly performed by Smith. For the reasons explained above, more than one person may be an "operator" of a given tank at a given time. The Act does not require that an operator have responsibility for *all* the daily operations of the UST. We think it sufficient that Smith engaged in at least two of the principal tasks performed at that point in time to find that he assumed, and was among the persons "having responsibility for" the "daily operation of the underground storage tank."

■■ On the facts before the Court, Unocal was never an operator within the meaning of the Act because neither Smith nor Murphy was ever an agent or employee of Unocal. Unocal's only relationship to Murphy was

---

20. Smith wore two hats—one as owner of the station he leased to others and the second as the commissioned driver who supplied the station. Neither party suggests that Smith's actions in

maintaining the tanks and pumps were performed solely in his capacity as owner of the tanks rather than a part of his duties as the commissioned driver.

that of seller to buyer. The gasoline delivered to the West Point tank was Murphy's, and Murphy accepted the attendant credit and other risks.

Shell's liability presents a more complex situation. During the time period when Murphy owned the bulk plant and Smith distributed Shell gasoline for Murphy, the result as to Shell is the same as for Unocal. The intervening jobber sufficiently disrupted the connection between Smith and Shell to remove Shell from liability in view of the trial court's finding that Shell did not in fact assume control over the operation of the tanks. However, Smith was a "commissioned driver" for Shell from 1946 to 1963.[21] During this time, Smith acted on Shell's behalf, dispensing gasoline owned by Shell into the storage tanks at the West Point station and measuring the contents of the tanks each time he filled them. He was presumably also acting on his own behalf as "lessor" whose rent was calculated by volume of gasoline sold. In addition, the lessees pumped gasoline for the retail customers and also stuck the tanks largely because they were not confident that Smith's measurements and records were always accurate. This is essentially all the record reveals as to the activities involved in the daily operation of the tanks in that time period.

Those who undertake the "operations" connected with the UST—filling and testing—cannot avoid liability simply because they were never required by law or by contract to undertake the obligation in the first place. The Landowners contend that avoidance of this liability is precisely the reason that major oil producers today check everything at a station except the USTs when they inspect for franchise or trademark purposes despite the fact that their agreements include requirements that the station be operated in compliance with state and federal environmental laws. In any event, Smith was not a rogue tank sticker wandering around rural Indiana. This aspect of operating the tanks was an integral part of Smith's role as a "commissioned agent" for Shell. He could not carry out his role for Shell without also performing these functions that are part of the operation of the tanks.

The trial court made no finding on the status of Smith vis-a-vis Shell before 1963 or Murphy after that time. However, it seems clear that Smith was an independent contractor, not an employee of either Shell or Murphy. Smith supplied his own truck and ran the route at times and in an order he determined. There was no withholding from his commissions, and he was paid on the basis of the gasoline he delivered, not the time he spent. Although the supplier of the gasoline may have had the practical ability to direct the details of how he performed the run, it is no greater than the ability of anyone who employs a contractor to perform a service and has the ability to terminate the contractor for unsatisfactory performance.[22]

In summary, for the reasons already given, Smith, first as an independent contractor of Shell, and later as an independent contractor of Murphy, was an operator. The statute imposes liability on operators regardless of fault. Although a principal is generally not liable for the actions of an independent contractor, Shell is derivatively liable for Smith's actions because Smith's work for Shell meets the exceptions to this general rule: the work is inherently dangerous and creates a nuisance.[23] Accordingly, Shell until 1963 was

---

**21.** Shell also argues that Smith acted as a jobber. We find no record evidence to support this conclusion and the trial court made no finding as to it. The evidence appears to contradict it. For example, Shell retained title to the gasoline Smith delivered.

**22.** Bill Murphy testified that the liability insurance for the bulk plant would have covered Smith in the case of an accident while driving the tank truck. The record is unclear as to why Mr. Murphy insured against vicarious liability for his independent contractor's actions. The record provides no evidence one way or another of the insurance situation pre-1963 when Smith was Shell's commissioned driver.

**23.** We are mindful that the jury rejected the common law claims against the Oil Companies. No issue is raised as to any of the relevant instructions and we express no opinion on them. As explained *supra* Part I, the Oil Companies contend the jury's result was necessarily based on a finding of lack of control. That is at least a possible rationale, and if correct, the jury's finding is not inconsistent with derivative liability under the Act.

liable for Smith's actions as its independent contractor delivering its gasoline into the tanks.

### B. *Time of the Release*

 The Act provides for contribution from a "person who owned or operated an underground storage tank *at the time the release occurred.*" IND.CODE § 13–23–13–8(b) (emphasis added). The trial court's findings included "plaintiffs submitted extensive evidence showing that ... the contamination had been leaking from the USTs at the station for decades, going back to the inception of Shell's operations in the 1940s." Although it is not as explicit as it might be, we take this as a finding that the contamination occurred during the time Smith was a commissioned driver for Shell. It is certainly supported by the evidence. As the trial court observed, "Dr. Keramida testified that the gasoline ha[d] been in the ground for a long time ... and that there is no doubt that the contamination that intercepted plaintiffs' well water was both a Shell and Union product." Additional evidence supports the conclusion that the tanks leaked prior to 1963. Dr. Keramida testified that evidence shows that after about five to ten years of operation, the majority of storage tanks leak. Although Dr. Keramida could not specify when the tanks began to leak, she did conclude, based on the entirety of the data, that the leak began "many years ago" in order for the contaminates to have been found where they were in 1989. James Bushman, a corrosion expert, testified that the size of the tanks found at West Point—500 to 1,000 gallon—indicated that they were installed in the 1940s or 50s. They were made with thinner steel plate walls that tended to perforate more quickly than larger tanks. Mr. Bushman also testified that USTs averaged a thirteen year life span before leaking according to testing done in the middle to late 1960s.[24] Assuming the tanks were new in 1946 when the West Point station became a

Shell station, it is more probable than not that they were leaking by at least 1959.

### V. Allocation between Shell and Unocal

Because we reverse the trial court's determination that Unocal was an "operator," Shell is the only defendant liable under the Act and so the allocation of costs between the Oil Companies is moot.

### Conclusion

We affirm the trial court's determination that Shell was an "operator" under the Act, but only for the duration of Shell's ownership of the bulk plant from 1946 to 1963. We reverse the trial court's determination that Unocal is liable under the Act and that Shell is liable for the period from 1963 to 1971. We summarily affirm the decision of the Court of Appeals with respect to the following issues: future corrective action costs, medical monitoring costs, attorney fees, and the trademark jury instruction. Ind. Appellate Rule 11(B)(3). This case is remanded for further proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON and SELBY, JJ., concur.

SULLIVAN, J., not participating.

---

24. Although not part of the record in this case, we note that, according to a Congressional Research Service report presented to Congress at the time it was considering the UST legislation, "[i]n the Great Lakes region, a typical tank may begin to leak within seven years of installation."

Donald V. Feliciano, "Leaking Underground Storage Tanks: a Potential Environmental Problem," Congressional Record, February 29, 1984, pp. S2026–S2030, *reprinted in* A LEGISLATIVE HISTORY OF THE SOLID WASTE DISPOSAL ACT AS AMENDED, at 2144 (1991).